DATE: December 29, 2022

CLERK OF COURT, EDPa
JAMES A BYRNE, U S COURTHOUSE
ROOM 260
215 597 7704 – Hit the * (star) ket
E-MAIL PAED_Documents@paed.uscourts.gov
601 MARKET STREET
PHILADELPHIA PA 19106

Dear Sir/Mam;

Enclosed you will find a Plaintiffs' CERTIFICATE OF SERVICES for the Defendants'
Attorneys, a FIRST AMENDED COMPLAINT and a PLAINTIFFS MOTION FOR LEAVE TO
FILE FIRST AMENDED COMPLAINT.

Would you please file these.

Thanks in advance;

Earlando Samuel, pro se
207 Parker Place
Glen Mills, PA 19342
610 241 7537
Easee2@gmail.com
**CASE# 2:22-cv-02451-WB**

Earlando Samuel, pro se

       plaintiff,

   vs

Delaware County Housing Authority, et al and,
Ingerman Property Management, et al

     defendants.

**Re: Settlement Offer for Case # 2:22- CV-02451-WB**

To: Attorney(s) For The Defendant(s)

Dear Sir\Mam;

I am sending this letter in hopes that we may reach an amicable settlement in the case referenced above.

Please be advised that although I am hopeful that we can reach a settlement on the below terms, this letter does not constitute a binding legal agreement. It should instead be considered the beginning of a conversation that may lead to a legally binding Settlement Agreement, acceptable to all parties. Due to the stressful nature of this litigation so far and the negative physical, mental and emotional stress related effect, amongst other things that I have suffered so far, my proposed settlement terms are as follows:

1. **Payment of eighty percent of the  $16,217,309.00** – Sixteen million, two hundred seventeen thousand and three hundred and nine dollars. demanded in my prayer for relief **in the amount of $12,973,847.20** (Twelve million, nine hundred and seventy three thousand, eight hundred forty seven dollars and twenty cents)  **to be divided equally amongst the Ingerman and Delaware County Housing Authority defendants as full and final satisfaction of all claims and disputes related to this case. Your client's portion would amount to $6,486,923.50** (Six million, four hundred and eighty six thousand, nine hundred and twenty three dollars and fifty cents).

2. A complete release and discharge of any and all claims, liabilities, causes of action, demands, defenses, damages, and costs of any kind or nature whatsoever.

3. A waiver of any potential claims, regardless of whether they are currently foreseen or currently accrued.

4. A dismissal document filed, with prejudice, in the court where the case is located.

5. The following additional terms:

**1. Recitals.** The foregoing Recitals are expressly incorporated as part of the Settlement Agreement, and the Parties confirm and represent to one another that said Recitals are true and correct to the best of their knowledge, information, and belief.

**2. No Admission of Liability.** It is expressly understood that this Settlement Agreement and the settlement it represents are entered into solely for the purpose of allowing the Parties to avoid further litigation. This Settlement Agreement does not constitute an admission by either Party of any wrongdoing, contractual obligation, or of any duty whatsoever, whether based in statute, regulation, common law, or otherwise, and each Party expressly denies that any liability or any such violation has occurred.

**3. Terms of Settlement.** In consideration for the Plaintiff's release of claims and execution of this Settlement Agreement, and in exchange for the promises, waivers, and releases set forth in this Settlement Agreement, the Defendant agrees to pay by Wire Transfer to the Plaintiff's bank in the amount of $ [6,486,923.50] (the **"Settlement Payment).** The Parties agree that the payment constitutes full compensation for all of the Plaintiff's claims. The Parties acknowledge and agree that they are solely responsible for paying any attorney's fees and costs incurred in the Litigation and that neither Party nor its attorneys will seek any award of attorney's fees or costs from the other Party, except as expressly provided herein.

**4. Tax Consequences.** The Parties make no representations regarding the Settlement Agreement's tax consequences. Each Party agrees that it will not assert a claim against the other Party for the payment or reimbursement of any tax consequences resulting from any payment made pursuant to this Settlement Agreement.

**5. Sufficient Consideration; Release of Claims.** The Parties acknowledge that the consideration provided to the Plaintiff under this Settlement Agreement is sufficient. In consideration for the payments herein provided, Plaintiff, to the maximum extent permitted by law, hereby irrevocably and unconditionally releases and discharges Defendant and its past or present predecessors, parents, subsidiaries, affiliates, successors, assigns, officers, directors, shareholders, attorneys, and employees, and any related or affiliated corporations or entities, and their past or present predecessors, parents, subsidiaries, affiliates, successors, assigns, officers, directors, shareholders, attorneys, and employees, and any person or entity acting through or in concert with any of the preceding persons or entities (all of the preceding persons and entities, severally and in the aggregate, will be referred to as Releasees) from any and all actions, claims, demands, debts, reckonings, contracts, agreements, covenants, damages, judgments, executions, liabilities, appeals, obligations, attorney's fees, and causes of action from the beginning of time to the date of this Settlement Agreement, known or unknown, asserted or unasserted, including but not limited to all claims arising under [insert all potential grounds for the plaintiff's claims](except as excluded below), emotional distress, punitive damages, or attorney's fees and costs, and any and all other claims arising under any law, rule, regulation, order or decision.

Excluded from this release are:

2

Claims that cannot be waived by law

Claims for enforcement of this Settlement Agreement

**6. No Other Pending Claims.** Plaintiff agrees and represents that it has no other pending legal actions or claims against Defendant, including in any court, arbitration forum, governmental or administrative forum or agency, or other dispute resolution forum that are in any way related to the Litigation or dispute described herein.

**7. Dismissal of Litigation.** Within 30 days after receipt of the Settlement Payment, Plaintiff and its counsel shall take any necessary actions to ensure that the Litigation is dismissed in its entirety, with prejudice and without costs or fees. Defendant will cooperate with Plaintiff in securing the dismissal of the Litigation as appropriate.

**8. Confidentiality.** The Plaintiff agrees that this Settlement Agreement, as well as the nature and terms of this settlement and the subject matter thereof, will be forever treated as confidential and the Plaintiff shall make no disclosure or reference to the terms of this Settlement Agreement to any person or entity, except to the Plaintiff's attorneys, members of Plaintiff's immediate family and, as necessary, tax preparers, provided that each such person agrees to be bound by the confidential nature of this Settlement Agreement. The Plaintiff and the Plaintiff's counsel may also make such disclosures pursuant to court or administrative order, subpoena, or as otherwise may be required by law. The Plaintiff acknowledges and agrees that Plaintiff's promise to maintain the confidentiality of the Settlement Agreement is an important element of the consideration for and inducement of the Defendant to enter into this Settlement Agreement. The Plaintiff further agrees that the Plaintiff's breach of this Settlement Agreement's confidentiality clause constitutes irreparable harm to the Defendant. In the event of an actual or threatened confidentiality breach, the Plaintiff consents to a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting commission or continuation of any actual or threatened breach. Nothing in this Settlement Agreement shall preclude the Plaintiff from stating, in response to any inquiry, that this dispute has been resolved by mutual Settlement Agreement and to the mutual satisfaction of the Parties, but it is expressly agreed that the Plaintiff shall make no further comment.

**9. Non-disparagement.** Each Party agrees that it shall not disparage the other Party, or any present or former officer, director, agent, or employee of either Party, whether to any current or former employee of either Party, the press or other media, or any other business entity or third party.

**10. Attorney's Fees.** Should any Party bring an action to enforce or interpret this Settlement Agreement, the prevailing party shall be entitled to an award of reasonable attorney's fees, in addition to any other relief to which the prevailing party may be entitled.

**11. Entire Agreement.** This Settlement Agreement comprises the entire agreement between the Parties and supersedes any and all prior oral and written agreements between them. This Settlement Agreement may not be altered, amended, or modified except by a further writing signed by the Parties.

**12. Severability.** If any of the provisions, terms, or clauses of this Settlement Agreement are declared illegal, unenforceable, or ineffective by an authority of competent jurisdiction, those provisions, terms, and clauses shall be deemed severable, such that all other provisions, terms, and clauses of this Settlement Agreement shall remain valid and binding upon both Parties.

**13. Choice of Law.** The validity and construction of this Settlement Agreement shall be governed by the laws of [jurisdiction], without regard to the principles of conflicts of laws. Any action to enforce this Settlement Agreement shall be brought only in [court].

**14. Severability.** A court's ruling rendering any provision(s) of this Settlement Agreement invalid or unenforceable shall not affect the validity of the remaining provisions of this Settlement Agreement.

**15. No Interpretation of Ambiguity Against the Drafter.** This Settlement Agreement has been negotiated and prepared by both Parties and their counsel. If any of the Settlement Agreement's provisions require a court's interpretation, no ambiguity found in this Settlement Agreement shall be construed against the drafter.

**16. Opportunity to Consult Legal Counsel.** The Parties confirm that they have reviewed and considered this Settlement Agreement and consulted with their attorneys regarding the terms and effect thereof.

**17. Authority to Settle.** Each Party represents and warrants that the person signing this Settlement Agreement has authority to bind the Party and enter into the Settlement Agreement.

**18. Counterparts.** This Settlement Agreement may be executed in two or more identical counterparts, all of which constitute one and the same Settlement Agreement. Facsimile or other electronically-transmitted signatures on this Settlement Agreement shall be deemed to have the same force and effect as original signatures.

A final settlement would be contingent upon an executed written agreement based on the terms listed above. Additionally, the Settlement Agreement would not contain an admission of liability or acknowledgment of wrongdoing.

If you would like to discuss these terms, please reach out to me at any of the contact points above. If you would like to accept, please send me signed, written confirmation that these terms are acceptable within five (5) business days, and we can have a formal Settlement Agreement drawn up.

4

**IN WITNESS WHEREOF**, and intending to be legally bound, the Parties hereto have caused this Settlement Agreement to be executed as of the date(s) set forth below.

On Behalf of Defendant:

By: _____

Printed Name: _____

Title: _____

Dated: _____

On Behalf of Plaintiff:

By: _____

Printed Name: _____

Title: _____

Dated: _____

Sincerely,

Earlando Samuel, pro se
207 Parker Pl
Glen Mills, Pa 19342
easee2@gmail.com
610 241-7537

Dated: _____, _____2023

5

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

EARLANDO SAMUEL, pro se,
plaintiff,

Civil Action No.: **2:22- CV-02451-WB**

vs:

DELAWARE COUNTY HOUSING
AUTHORITY, et al, and
INGERMAN PROPERTIES, et al :
Defendant(s) :

## CERTIFICATE OF SERVICE

Earlando Samuel, pro se, certifies that on this day, December 29, 2022, that a copy of a **FIRST AMENDED COMPLAINT** AND A **MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT** was sent to the following by U S Mail:

**Connie E Henderson**, Esquire, and Sheryl l Brown, Esquire ICO  **SIANA LAW** 941 Pottstown Pike, Suite 200, Chester Springs, PA 19425 610 321 5500 and, **Catherine E Lubin**, ICO **BALLAD SPAHR, LLP.** 1735 Market Street, 51st Floor, Philadelphia, Pa. 19103

:

Earlando Samuel, pro se
207 Parker Place
Glen Mills, PA 19342
610 241 7537
easee2@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EARLANDO SAMUEL,

               Plaintiff,

                          CIVIL ACTION NO. 2:22-CV-02451-WB

               v.

DELAWARE COUNTY
HOUSING AUTHORITY,
et al, and
INGERMAN PROPERTY
MANAGEMENT, et al

               Defendants

### PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiff EARLANDO SAMUEL respectfully moves the Court for leave to file a First Amended Complaint. Rule 15 provides that "a party may amend its pleading [with] the court's leave" and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

Allowing Plaintiff to file the Amended Complaint would serve justice and promote judicial efficiency. Further, there would be no substantial or undue prejudice, bad faith, undue delay, or futility. Through the Amended Complaint, Plaintiffs seek to add exhibits 15, 16, 17, 18, 19.

Further, Plaintiffs seek to allege new counts based on the conduct and practices uncovered by Plaintiff since the original Complaint and modification of the Prayer For Relief, Basis For Jurisdiction, Injuries, and Parties To Complaint.

For all the above reasons Plaintiff respectfully request that the Court grant Plaintiff leave to file the Amended Complaint.

Respectfully Submitted,

_Earlando Samuel_ (signature)

Earlando Samuel, pro se
207 Parker Place
Glen Mills, PA., 19342
610 241 7537
easee2@gmail.com

Dated: _December 29_, 2022

cc/file

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

---

**EARLANDO SAMUEL, pro se**

---

**VS**

*(In the space above enter the full name(s) of the plaintiff(s).)*

**- against -**

**"SEE  ATTACHED"**

---
---
---
---
---
---
---
---
---
---

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**FIRST
AMENDED
COMPLAINT**

Jury Trial:  ☒Yes    ☐ No

*(check one)*

**CASE 2:22-cv-02451-CBK** W B

I.      **Parties in this complaint:**

A.      List your name, address and telephone number.  If you are presently in custody, include your identification number and the name and address of your current place of confinement.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper as necessary.

| | | |
|---|---|---|
| Plaintiff | Name | **EARLANDO SAMUEL** |
| | Street Address | **207 PARKER PLACE** |
| | County, City | **GLEN MILLS** |
| | State & Zip Code | **PENNSYLVANIA 19342** |
| | Telephone Number | 610 241 7537 |

*Rev. 10/2009*

B.   List all defendants.  You should state the full name of the defendants, even if that defendant is a government agency, an organization, a corporation, or an individual.  Include the address where each defendant can be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1

Name   **THE DELAWARE COUNTY HOUSING AUTHORITY**

Street Address   **1855 CONSTITUTION AVE.  #1**

County, City   **WOODLYN**

State & Zip Code   **PENNSYLVANIA 19092**

Defendant No. 2

Name   **LAURA BLACKBURN, DIRECTOR**

Street Address   **1855 CONSTITUTION AVE. #1**

County, City   **WOODLYN**

State & Zip Code   **PENNSYLVANIA 19092**

Defendant No. 3

Name   **DAWN WARE, SENIOR HCV SPECIALIST**

Street Address   **1855 CONSTITUTION AVE #1**

County, City   **WOODLYN**

State & Zip Code   **PENNSYLVANIA 19092**

Defendant No. 4

Name   **"SEE ATTACHED"**

Street Address _____

County, City _____

State & Zip Code _____

## II.   Basis for Jurisdiction:

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.   What is the basis for federal court jurisdiction? *(check all that apply)*
   ☒ Federal Questions          ☐ Diversity of Citizenship

B.   If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? _____

*See attached* 4 B

I.    PARTIES IN THIS COMPLAINT: CONTINUED

II.   B. List all defendants

4. CHRISTINA PRO, HCV SPECIALIST
1855 CONSTITUTION AVENUE #1
WOODLYN, PENNSYLVANIA 19092

*5. CATHERINE CUENY, ADMISSIONS SPECIALIST/DCHA*
*1855 CONSTITUTION AVENUE # 1*
*WOODLYN, PENNSYLVANIA 19092*

6. INGERMAN PROPERTY MANAGEMENT
5 POWELL LANE
COLLINGSWOOD, NEW JERSEY 08108

7. RASHIDA SMITH, PROPERTY MANAGER
452 PARKER PLACE
GLEN MILLS PENNSYLVANIA 19342

8. RYANN WILLIAMS, ASSISTANT PROPERTY MANAGER
452 PARKER PLACE
GLEN MILLS PENNSYLVANIA 19342

9. NEFERTITI RIVERS, GENERAL PROPERTY MANAGER
452 PARKER PLACE
GLEN MILLS PENNSYLVANIA 19342

10. TERRI HARDIN, ASSISTANT PROPERTY MANAGER
452 PARKER PLACE
GLEN MILLS PENNSYLVANIA 19342

11. GREG WARD, MAINTENANCE MANAGER/ASSISTANT PROPERTY
MANAGER
452 PARKER PLACE
GLEN MILLS PENNSYLVANIA 19342

## II. (B) BASIS FOR JURISDICTION

**1. THE FAIR HOUSING ACT <u>TITLE 24 – HOUSING AND URBAN DEVELOPMENT SUBTITLE B - REGULATIONS RELATING TO HOUSING AND URBAN DEVELOPMENT  CHAPTER I - OFFICE OF ASSISTANT SECRETARY FOR EQUAL OPPORTUNITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT PART 100 - DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT</u> Subpart F - Interference, Coercion or Intimidation § 100.400 Prohibited interference, coercion or intimidation.**
(a) This subpart provides the Department's interpretation of the conduct that is unlawful under section 818 of the <u>Fair Housing Act</u>.
(b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any <u>person</u> in the exercise or enjoyment of, or on account of that <u>person</u> having exercised or enjoyed, or on account of that <u>person</u> having aided or encouraged any other <u>person</u> in the exercise or enjoyment of, any right granted or protected by this part.
**(c) Conduct made unlawful under this section includes**, but is not limited to, the following:
(1) **Coercing a <u>person</u>**, either orally, in writing, or **by other means**, to deny or limit the benefits provided that <u>person</u> in connection with the sale or rental of a <u>dwelling</u> or in connection with a residential real estate-related transaction because of race, color, religion, sex, **handicap,** familial status, or national origin.
(2) Threatening, intimidating or **interfering** with <u>persons</u> in their enjoyment of a <u>dwelling</u> because of the race, color, religion, sex, **handicap,** <u>familial status</u>, or national origin of such persons, or of visitors or associates of such persons.
 (5) **Retaliating against any <u>person</u> because that <u>person</u> has made a complaint,** testified, assisted, **or participated in any manner in a proceeding under the <u>Fair Housing Act</u>**

**2.Title 18, U.S.C., Section 241 - Conspiracy Against Rights**
Civil Rights Conspiracy Statute - **Section 241** makes it unlawful for two or more persons to agree to injure, threaten, or intimidate an individual in the free exercise or enjoyment of his or her rights.

**Conspiracy is an agreement between two or more people to commit an illegal act, along with an intent to achieve the agreement's goal.** Most U.S. <u>jurisdictions</u> also require an <u>overt act</u> toward furthering the agreement.  An overt act is a statutory requirement, not a constitutional one. See <u>*Whitfield v. United States*</u>, 453 U.S. 209 (2005). The illegal act is the conspiracy's "target <u>offense</u>."

Conspiracy generally carries a <u>penalty</u> on its own.  **In addition, conspiracies allow for derivative <u>liability</u> where <u>conspirators</u> can also be punished for the illegal acts carried out by other members, even if they were not directly involved.**  Thus, where one or more members of the conspiracy committed illegal acts to further the conspiracy's goals, all members of the conspiracy may be held accountable for those acts.

<u>**Conspiracy**</u> against rights is a <u>federal offense</u> in the <u>United States of America</u> under <u>18 U.S.C. § 241</u>:

1

If two or more persons conspire to injure, oppress, threaten, or intimidate any person [...] in the free exercise or enjoyment of any right or privilege secured to him by the <u>Constitution</u> or laws of the United States, or because of his having so exercised the same;...

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include <u>kidnapping</u> or an attempt to kidnap, aggravated <u>sexual abuse</u> or an attempt to commit aggravated sexual abuse, or an attempt to <u>kill</u>, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.[1]er constitutionally protected rights.

### 3. TITLE 24 §982.316(b)(1,2,3)  LIVE-IN AIDE.
(b) At any time, the PHA may refuse to approve a particular person as a live-in aide, or may withdraw such approval, **if:**
(1) The person commits fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;
(2) The person commits drug-related criminal activity or violent criminal activity;
(3) The person currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act.

With the exception of the defendants' **there were no violations of this Title** by me nor was I or my live in aide accused of any.

### 4. Title III of the Americans with Disabilities Act of 1990 (ADA) prohibits discrimination on the basis of disability in places of public accommodation (42 U.S.C. § 12182(a)).

**The ADA does not stipulate that a disability has to be visible for a person to receive protection** from discrimination. Oftentimes, people with invisible disabilities face discrimination because there are many false assumptions about needed accommodations for this subset of the population. **They have the same legal rights as other people with disabilities – rights to access, accommodations, and they are not to be discriminated against based on their disability.**

### 5. "Bait & Switch" tactics are in violation of 15 USC CHAPTER 2, SUBCHAPTER I: FEDERAL TRADE COMMISSION
§45. Unfair methods of competition unlawful;
**(a)** Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade
(1) Unfair methods of competition in or affecting commerce, **and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.**
(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. 181 et seq.], except as provided in

2

section 406(b) of said Act [7 U.S.C. 227(b)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

**6. Federal Trade Commission Act**
**Section 5: Unfair or Deceptive Acts or Practices**
**Deceptive Practices**
**An act or practice is deceptive where a representation, omission, or practice misleads or is likely to mislead the consumer;** a consumer's interpretation of the representation, omission, or practice is considered reasonable under the circumstances; and the misleading representation, omission, or practice is material.

**7. 73 P.S. §§201-1 - 201-9.2**
**PENNSYLVANIA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW §201-2**
(4) "Unfair methods of competition" and "**unfair or deceptive acts or practices**" mean any one or more of the following:
**(ix) Advertising goods or services with intent not to sell them as advertised; aka "Bait & Switch".**

**8. 18 U.S. Code § 2261A – Stalking**
Whoever— (1) **travels in interstate………..,** with the intent to kill, injure, **harass, intimidate,** or place under surveillance with intent to kill, injure, harass, or intimidate another person, **and in the course of, or as a result of, such travel or presence engages in conduct that— (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i),** (ii), or (iii) of subparagraph (A);
shall be punished as provided in section 2261(b) or section 2261B, as the case may be.

**9. THE TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
The tort of intentional infliction of emotional distress (IIED) occurs when one acts abominably or outrageously with intent to cause another to suffer severe emotional distress, such as issuing the threat of future harm.

C.    If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

Plaintiff(s) state(s) of citizenship _____

Defendant(s) state(s) of citizenship _____

## III.    Statement of Claim:

State as briefly as possible the <u>facts</u> of your case.  Describe how <u>each</u> of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    Where did the events giving rise to your claim(s) occur?  **"SEE ATTACHED"**

_____

B.    What date and approximate time did the events giving rise to your claim(s) occur? _____

**"SEE ATTACHED"**

_____

C.    Facts:  **"SEE ATTACHED"**

[Form field box:] What happened to you?

[Form field box:] Who did what?

[Form field box:] Was anyone else involved?

[Form field box:] Who else saw what happened?

*Rev. 10/2009*

- 3 -

## III. FIRST AMENDED STATEMENT OF CLAIM CONTINUED

1. Plaintiff is a 70 year old black male, deemed to be Disabled by the Social Security Administration, with "invisible disabilities". Invisible Disabilities are medical conditions that interfere with the usual activates of daily life, but are not immediately apparent to others. The term *invisible disabilities* also refers to symptoms such as debilitating pain, fatigue, dizziness, cognitive dysfunctions, brain injuries, learning differences and mental health disorders, as well as hearing and vision impairments. These are not always obvious to the onlooker, but can sometimes or always limit daily activities, range from mild challenges to severe limitations and vary from person to person. Because others are unable to see these disabilities, they can lead to people with invisible disabilities being falsely judged or discriminated against.

2. On 2 21 2019 I applied via an e-mail to Birchwood Ingerman At Concord in 1112 Smithbridge Rd/452 Parker Place Glen Mills, Pennsylvania, 19342 610 558 3789, a tax credit property, (The federal government issues tax credits to state and territorial governments. **State housing agencies then award the credits to private developers of affordable rental housing projects through a competitive process**. Developers generally sell the credits to private investors to obtain funding. Once the housing project is placed in service (essentially, made available to tenants), investors can claim the LIHTC over a 10-year period.) in regards to an advertisement for leasing a two bedroom apartment soon becoming available. The advertisement stated that Housing Choice Vouchers (Section 8) were acceptable for that unit. I possessed a 2 Bedroom Housing Choice Voucher. (exh 1). In the past I had **"ported" out** from one Public Housing Authority (PHA) to another several times without any issues or problems.

**"Portability"** in the HCV (Housing Choice Voucher) program refers to the process through which the family **can transfer or "port" their rental subsidy** when they move to a location outside the jurisdiction of the public housing agency (PHA) that first gave them the voucher when they were selected for the program.

- **Initial PHAs** -The PHA that first gave the voucher to the individual when they were selected for the program.
- **Receiving PHAs**- The agency that will administer assistance in the area to which the individual moves.
- **There is a 60 day time window to find a unit and to move in**. This includes having the paperwork done and other things associated with **"porting out"** from one PHA to another such as finding housing, credit checks, cutting on and off utilities, transferring insurances, mail, etc.

3. **About Ingerman-Birchwood** Catering to individuals with low to moderate or fixed incomes, Birchwood has more than 20 affordable locations throughout the Mid-Atlantic. They claim that they will make your choice of moving to a senior community not something you are choosing to do, but something you want to do. These communities are part of the Low Income Housing Tax Credit (LIHTC) program. This program is designed to offer affordable housing to only those individuals whom meet specific income requirements. **Ingerman-Concord Pointe is** an age-restricted community that is marketed as a 55+ community. My annual inspection is the

1

responsibility of the Delaware County Housing Authority. I am required to have only one Housing Quality Inspection (HQS} inspection a year.

4. On 09 18 2019 I received an e-mail from RyAnn Williams, assistant property manager of Ingerman Birchwood At Concord in regards to an advertised available 2 bedroom unit for rent. (exh 1) Prior to that I had put an application in response to an advertisement in February of 2019. Unknown to me at the time, this was the "Bait" of an elaborate "bait and switch" chain fraud (where there are several actors from Ingerman Property Management Company and the Section 8 department of the Delaware County Housing Authority and each has a role to play) scheme that caused me to lose my 2 bedroom Housing Choice voucher, my Live In Aide, personal possessions but to also cause me to move into an undesirable upstairs 1 bedroom small efficiency apartment . Due to my osteoporosis and degenerative joint disease, stairs and inclines are my worst enemies when it comes to pain management that cause great pain and suffering lasting for days.

5. On 10 28 '19 I was informed via telephone by RyAnn Williams of Ingerman Birchwood At Concord that I had been approved for the two bedroom tenancy. I was instructed to come into the office in Glen Mills the next day to sign paperwork. At that time I asked her to have a copy of the lease available for my records.

6. On 10 29 '19 I met with RyAnn Williams. assistant manager of Ingerman-Concord Pointe. While we were waiting for a nurse friend of mine to arrive, her topic of conversation went into my experiences as a voucher holder. She told me that I reminded her of her uncle and that I "didn't look disabled". I asked how does a disabled person look?  At that time my friend arrived. RyAnn had me re do the application process over again. When asked why her response was "because the originals were old". She constantly distracted me as I was filling out paperwork but I did notice that one of the documents that I had signed and kept was a last page that was going to be attached to other pages to make a complete document.

7. After that was done I asked to see the apartment but was informed by RyAnn that the apartment wouldn't be ready for occupancy until 11 15 '19 because it was still occupied by the tenant and I could not see it. I thought that was odd because most property owners have a clause in their lease that allow viewing by potential renters while the unit is occupied. RyAnn said that we could see a unit that was on the first floor but it was a one bedroom unit but would give me an idea of what the two bedroom looked like.

8. As we were leaving the office, Ryann suggested that we look at some of the greenery in the back of the development. That entailed using a "walking trail" put in place for the use of the tenants that walk for exercise. I could only walk approximately 20 feet before developing aches and pain. I told them to go on. I now suggest that was Ryanns' version of a "degree of impairment test". After taking a look at the unit on the first floor, I told RyAnn that it was workable in the 2 bedroom configuration. She gave me a blank lease, which I found out later, and we left.

9. On or about 11 6 '19 I delivered a sealed Voucher Packet from the Delaware County Housing Authority to  RyAnn Williams, Assistant Property Manager,  Ingerman Birchwood At Concord,

1112 Smithbridge Rd/452 Parker Place, Glen Mills, Pennsylvania, 19342. Before I could move forward this Packet held information that was required by the Housing Authority from the landlord or its agent. The packet that I received back from RyAnn Williams was also in a sealed envelope.

10. On or about 11 27 '19 I met with Rashida Smith, Senior Property Manager, Ingerman Birchwood At Rodney Court to sign a lease again. This time and unbeknownst to me at that time, it was for a 1 bedroom apartment with the address of 207 Parker Place, Glen Mills, Pa., 19342.

11. I had a intake appointment scheduled for November 5th, 2019. That meeting was attended by Laura Blackburn, Director and the person that was doing my intake, Catherine Kueny, Applications and Admissions Specialist. The information that RyAnn Williams submitted was rejected again for the third time for reasons unknown to me by the Delaware County Housing Authority. (DCHA) The (DCHA) gave me a document to give to Ingerman or agent of that stated that an "Original lease and 2 copies" were needed.

12. On November 27, 2019, I was called and told to come into the office of Ingerman-Concord Pointe. I was given another 25 page lease by Rashida Smith, General Manager, to sign and to take back to Catherine Kueny of the Delaware County Housing Authority. The date of this lease was November 27, 2019 with an address of 207 Parker Place, Concord, Pa. (exh 15 first and last page of lease) After delivering this lease to Catherine Kueny of the DCHA, I was given paperwork in a sealed envelope to take back to Rashida Smith, GM of Ingerman, At that time I was given a copy of the lease, the key to 207 Parker Place and a key to the mailbox for 207 Parker Place. Not known to me then, this was a scheme that started on September 18, 2019 to deprive me of my two bedroom (exh 2) voucher. It was fraudulently taken and my account downgraded to a 1 bedroom through a process of manipulating dates, numbers and my signature, wrongfully downgraded and changed to a 1 bedroom voucher. This falsified 1 bedroom voucher gave the appearance that when I transferred into the Delaware County Housing Authority, that I came with a 1 bedroom voucher instead of a 2 bedroom voucher. (exh 3). I had no choice but to accept this "switched" unit because I had to have my old unit in Delaware vacated and cleaned and moved into the new unit by 11 30 '19. I was at that point of no return and took the 207 unit **under undue influence** (Oxford dictionary definition defines the phrase like this: **"Influence by which a person is induced to act otherwise than by their own free will or without adequate attention to the consequences."** For example, a <u>personal caretaker</u> might unduly influence an elderly person experiencing dementia, amnesia, or Alzheimer's disease in order to compel the elderly person to alter a will to favor the caretaker. I suffer from mild cognitive disorder and was not on any meds for that during the times of the transfer to the DCHA. I wasn't put on proper meds, Aricept 10mgs, for that until after moving to Pennsylvania. It was either that efficiency unit or the street. That fraudulent 1 Bedroom voucher document was approved by Laura Blackburn, Director and signed by Dawn Ware, Senior Housing Choice Voucher specialist. (exh 3). To add insult to injury, being that the lease for 207 didn't start until December 1, 2019, I had to pay out of pocket for the days leading up to that date to move my belongings into the unit.

13. In furtherance of the defendants' "bait and switch" scheme and after I started complaining about the wrongdoings in regards to my 2 bedroom voucher, my living situation about the stairs, and my need for my live in aide, the Ingerman Concord Pointe employee's in collusion with

Christina Pro, my caseworker at the Delaware County Housing Authority (DCHA) entered into a campaign of harassment and unfair treatment. For example on or about 12 5 '19 I was called into the office by RyAnn Williams. What she wanted from me was an explanation about expenditures that I had made. She had harvested protected privacy information from my 4 bank statements that I gave her under the threat of being in violation of the lease if I didn't. I also had to sign a statement in regards to a payment for a debt consolidation loan. I went along with these things out of fear of retribution. (Bank statements are for verification of an active bank account.} This company has verification forms. There was no legitimate reason to ask for my bank statements. This amounts to violation of privacy laws, theft of personal information and harassment.

14. On or about 4 1 '20 while visiting the office to pay my rent, I was informed as I was walking out the door by Rashida Smith, Senior Property Manager, Ingerman Birchwood At Concord and at Rodney Court, that I had to turn my T V off at 10:30 pm. I was given a 10:30 curfew. I addressed this in a "cease and desist" letter dated 7 15 20 to Rashida Smith, Property manager (exh 4)

15. On 7 6 '20 at approximately 5:20 pm I heard a knock on my front door. Someone attached a note to my door that I would have a "mandatory pre-inspection" starting the next day. I was awoken at 9:30 am the next morning by Greg Ward the maintenance manager hollering. He had used his master key to enter my home and without giving the proper 48 hour notice I addressed this in a letter dated 7 15 '20 to Rashida Smith (exh 4)

16. On 3 12 '21 I requested a copy of my file from defendant Rashida Smith. That request went ignored.

17. During post pandemic recovery, on March 1st, 2021 I was informed by Ryan Williams replacement, Terri Hardin, assistant manager of Ingerman, Concord Pointe apartments, that I was responsible for 3 months of the full amount Housing Assistance payments (exh 5) even though my out of pocket payments were made on time as usual. My caseworker, Christina Pro, is responsible for making the HAP payments and any other financial situations in regards to my account, such as re-certifications. I e mailed her in re to this matter and this is her response "I have made the correction to the Annual Reexamination. Payment should be made around the 15th of March. Payments will catch up at that time." The significance of the three months of missing rental payments is that after three months of non payment of the rent the property owner (Ingerman Concord Pointe) can move for eviction and if you are evicted a person with a voucher can/will lose their voucher.

18. On June 7th, 2021 I sent Christina Pro an e mail in regards to resolving the matter of my two bedroom voucher. Her response to my question was a Notice Of Lease And Contract. In this letter Christina Pro raised my out of pocket rental payment 368%. The reason she gave was a change in family income or family composition. On June 25th, 2021 I sent her a letter telling her that the only increase in income that I had was a 1.3% COLA and that there were no additions to my family In it I reserved my right to an Informal hearing in regards to the matter of the increase. I requested from her the computations that she used to arrive at her figures for that increase. To date even after a second request I haven't received a response from Christina Pro in regards to that.

4

19. I was left with no choice but to send a complaint to the PA Attorney General's office on 7 21 2-'21 (exh 6) that was forwarded to HUD OIG on 7 29 '21 in regards to these alleged wrongdoings by Christina Pro and Terri Hardin such as holding me responsible for the full amount of rent along along with increasing my out of pocket rent were threats, punishment and warnings of things to come if I keep pursuing the re-instatement of my rightfully owned two bedroom voucher by Terri Hardin, assistant manager of Ingerman, Concord Pointe apartments and Christina Pro, my Sec 8 caseworker for the Delaware County Housing Authority 1855 Constitution Ave  Woodlyn, PA 19094.

20. On 8-18-2021 I e-mailed a 2nd Cease And Desist Letter (exh 7) to Rashida Smith, Nefertiti Rivers, General Manager, Terri Hardin, Asst. property manager and to Ingerman Property Management in regards to the retaliatory acts, harassment and unfair treatment that I was being subjected to because of my pursuits in regards to my wrongfully taken 2 bedroom voucher.

21. My out of pocket payments went like this…**162.00 initially**. I complained and asked questions about what happened to my 2 bedroom voucher….OOP (out of pocket) went **down to 16.00**…(I allege that amount was to keep me from asking about my 2 bedroom Voucher or complaining any further,  I complained and asked about my 2 bedroom voucher…my out of pocket went **up to 58.00**….I requested information as to how caseworker Christina Pro arrived at those figures and also reserved my right to a Fair Hearing that went ignored …my out of pocket went up to 3 months of the **full apartment rental amount, 2070.00** according to Terri Hardin, assistant property manager.

**22-A.** On 8 8 '21, I e-mailed Laura Blackburn, Director in regards to the above wrongdoings and ongoing activities. Her response was that basically there weren't any wrongdoings and I would have to repeat the process in regards to a live in aide to re instate my 2 bedroom voucher (exh 8). If this was true, which it isn't because I "ported" out, **"Portability"** in the HCV (Housing Choice Voucher) program refers to the process through which the family **can transfer or "port" their rental subsidy when they move to a location outside the jurisdiction of the public housing agency (PHA) that first gave them the voucher when they were selected for the program."** and I had done this in the past without any issues of having to downgrade to a 1 bedroom voucher and get medical clearance for my live in aide over again, again if this was true why didn't the employees' of the DCHA vested with the  "porting out" process including Laura Blackburn, Director never tell me that I would have to basically re apply because my two bedroom voucher was useless to the DCHA.

**22-B.** Laura Blackburn, Director signed off on the fraudulent 1 bedroom voucher in November of 2019 so knew or should have known, that downgrading my 2 bedroom voucher which made me lose my live in aide was wrong. In her response to my concerns in exhibit 8, her response to the 2 bedroom voucher was "I'm not sure". How can a Director of the DCHA not be sure of their rules, regulations or policies? These are some of the same wrongful behaviors that left me no choice but to submit a Complaint to **HUD Investigations** May of 2003 which subsequently led to 2 Audits of the Delaware County Housing Authority by **HUD Investigations**. (see **Circumstantial Evidence** paragraph 41 exhs 16,17,18)

23. I'm alleging that those out of pocket raises were another example of retaliation and the Mens Rea (criminal intent) for my activities in pursuit of my 2 bedroom voucher and also as punishment for me complaining again about the wrongful taking of my two bedroom voucher through the "illegal bait & switch" scheme that was perpetrated by Rashida Smith and Ryan Williams of Ingerman Concord Pointe along with Christina Pro, HCV specialist, Dawn Ware, Senior HCV specialist and Laura Blackburn, Director all of the Delaware County Housing Authority. Whenever I complained or even questioned about the taking of my two bedroom voucher, there would be threats of financial retribution. For example, Terri Hardin sent me an e mail saying that I owed 3 months of the full rental amount. when I merely mentioned my loss of the two bedroom voucher.

**FINANCIAL HARASSMENT**

24. On 10 28 '21 I found attached to my door paperwork named "Completing your Self-Certification (exh 9). Stated in the summarys' first paragraph that "This certification is your annual self-certification……". In section VI-RENT it shows my Tenant Paid Rent to have reverted back to the $16.00 out of pocket. In section 3) TENANT INCOME CERTIFICATION b) part VI it states "For clarification, your rent amount is only the "TENANT PAID RENT" and that is all you will continue to pay until a yearly rent increase." In reality this was a ploy to lead me to believe that my out of pocket had been reduced back to the 16.00. After paying the 16.00 for three months, I received a Notice Of Delinquent Rent (exh 10). This was another fraudulent act by the defendants put in place harass, intimidate and inflict emotional distress.

25. I hand delivered two checks, one for the usual $59.00 the other for the $16.00, along with an inquiry letter asking which one is the correct amount of my out of pocket to the office, I told them to use the check for either the 16.00 or the 59.00 for my out of pocket rent for that month and remit to me the other. The check in the amount of 16.00 was given back to me.

26. On 1 20 '22 I found attached to my door a "Notice Of Delinquent Rent" (exh 11) authored by Nefertiti Rivers, General Manager of Ingerman Concord Pointe. The notice stated that I owed $129.00 in delinquent rent for the months of November and December of 2021 and $59.00 for the month of January, 2022. It also stated that "in the event that you fail to pay….the landlord will pursue remedies to the extent of the law".

27. I paid that amount "under protest" because according to the Notice because it became clear as glass that I was put in the "eviction zone" due to the fraudulent scheme engineered and carried out by Nefertiti Rivers, Terri Hardin and Christina Pro.

28. On 4 12 '22 I received another "FIVE DAY NOTICE OF DELINQUENT RENT" (exh 12) that was placed on front door authored by Nefertiti Rivers, General Property Manager. In it it states that I owe $248.00 in delinquent rent and that I have 'five days to cure delinquent rent " and I assume by her quoting a Delaware statute even though I live in Pennsylvania and so is my residence, her and Ingermans' intent is to evict me again. The letter stated that I owe the current months balance of $22.00 a current late fee of $50.00, a previous rental balance of $176.00 for my previous rental balance for the months of August 2021 through March of 2022. (exh 12)

29. I sent Nefertiti Rivers a letter of dispute and inquired as to how she arrived at those figures. The next day she produced a document that appeared to come from the Delaware County Housing Authority dated 3 10 22 that shows that an adjustment had been made to my account and that my out of pocket had been increased to $81.00. (exh 13). This document wasn't signed and it was not from my caseworker. Also, I was never given a notice or any mailings, e mails, etc. in regards to this increase. Also, these increases are based in financial statements made by the recipient in their annual re certification. To the best of my memory I didn't do one. I paid the $248.00 under protest and duress. This is just another example of how fraudulent documents are made up by the defendants' to fit the occasion

30. The same tactics, falsifying statements, creating fraudulent documents and lying were used to take my 2 bedroom voucher. There was no concern from any of the defendants about the negative effects that would have on me.

31. In acts of retaliation Neftertiti Rivers and Terri Hardin with the aid of Dawn Ware and Christina Pro of the DCHA manufactured documents and falsified statements and fraudulent documents to give the appearance of me being behind in rental payments. Even with their threats of eviction, these defendants' knew that these fraudulent documents couldn't prevail in Court to evict me. Their creation and intent was to harass and create fear and apprehension in me which it did in their quest for a Constructive Eviction.

32. The legal term *constructive eviction* refers to a landlord's action – or failure to take action – that makes the premises uninhabitable, or which robs the tenant of the use and enjoyment of the premises. This occurs without taking steps to legally evict a tenant, rather simply making staying so miserable and stressful that the tenant just leaves. Constructive eviction is not lawful, and may apply to both residential and commercial premises.

33. I submitted and updated complaint through the HUD OIG portal on 5 4 2022 and a follow up sent on 06/06/'22. . https://www.hudoig.gov/hotline/hotline-form

The number of characters that can be used in a report are limited and After finished filling out an online complaint, you are presented with a "Submit" button. After you click on the submit button, your complaint is sent and that window is closed and you are sent to another page. You are not given any reference numbers, contact information, a copy of or anything else that is proof of the complaint that was submitted. There is no provision to submit documentation in support of what a person is alleging in their complaint/report.

The following is an excerpt from the HUD OIG website in regards to what happens after making a HUD OIG report.

"The decision to pursue a Hotline report either through an investigation, audit, or review, rests exclusively with the OIG. The OIG will not provide you with case status updates or other information while the case is under review."

"Under no circumstances will the OIG provide you with the status of action taken on an allegation." https://www.hudoig.gov/hotline/report-fraud"

I would have like to attach the outcome of OIG's findings but I don't have any way of knowing when or if they will get back to me.

34. I made a police report of these ongoing wrongdoings with the PA State Police on 6 8 2022 with hopes that the defendants would stop their threatening behaviors. A state policeman did follow up on my complaint about the harassment.

35. Through the conspiracy and concerted efforts of the employees' of Ingerman and the Delaware County Housing Authority using the illegal "bait and switch fraud scheme", I wound up with a one bedroom Voucher and a upstairs one bedroom not very marketable unit with one tiny closet without my live in aide with stairs. Stairs and inclines are my worst enemy because of the lasting pain and other negative effects associated with climbing them due to my Degenerative Joint Disease amongst other things.

36. I never asked for a Live In Aide. The notion of a Live In Aide was suggested to me as being medically necessary by my primary physician in 2012. The 2 bedroom voucher was approved by the Delaware State Housing Authority in 2012. I "ported out" to New Castle County Housing Authority in 2016. My 2 bedroom voucher is based on medical determinations and psychological reports, diagnosis(s}, prognosis(s) and treatment plans made by medical doctors, psychologists, therapists  and the determination of "disability" by the Social Security Administration. The people whom I have named above, Rashida Smith, General Manager, Ryan Williams, Assistant Manager, Nefertiti Rivers, General Manager, Terri Hardin, Assistant Manager, Greg Ward, Maintenance of Ingerman, Concord Pointe Apartments and Christina Pro, Caseworker and Laura Blackburn, Director of the Delaware County Housing Authority, maintenance and office personnel , superseded the diagnosis(s) and determinations of my medical professionals and the SSA to make their own determination that I don't need a live in aide by fraudulently  and wrongfully relieving me of my two bedroom voucher. (exh 14 – Defendant Structure)  **FRAUD** In <u>law</u>, **fraud** is <u>intentional</u> <u>deception</u> to secure unfair or unlawful gain, or to deprive a victim of a legal right. Fraud can violate <u>civil law</u> (e.g., a fraud victim may sue the fraud perpetrator to avoid the fraud or recover monetary compensation) or <u>criminal law</u> (e.g., a fraud perpetrator **may** be prosecuted and imprisoned by governmental authorities).

37. I have been and still am at the time of this filling, being harassed, threatened, retaliated against, and being treated unfairly because I filed complaints, testified, assisted, and participated in different manners in  pursuit of and return of my 2 bedroom voucher and my Live In Aide, which were wrongfully taken from me through a conspiracy perpetrated on me and that I am a victim of, through and by the concerted efforts of the defendants'.

38. The defendants' conduct was more than malicious and intentional. More than mere indignities, annoyances or petty oppressions but so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. The defendants' acted (1) intentionally; (2) their conduct was extreme and outrageous; (3) their conduct was the cause (4) of me suffering such severe emotional distress and physical pain and illness that I had to seek medical and spiritual help for the years of the intentional infliction of emotional distress I had to endure at the hands of the defendants'.

39. The defendants' Rashida Smith, Greg Ward, Terri Hardin and Nefertiti Rivers live outside of of the State of Pennsylvania. They traveled to Pennsylvania across State lines for not only employment but also with the intent to harass me, intimidate me and to cause me substantial emotional distress. **Harassment** - Harassment refers to words or behavior that threatens, intimidates, or demeans a <u>person</u>. Harassment is unwanted, uninvited, and unwelcome and causes nuisance, alarm, or substantial <u>emotional distress</u> without any <u>legitimate</u> purpose.

40. I am alleging that my invisible impairments or lack of visible impairments along with retaliation is the **<u>underlying</u> purpose; intention** for the defendants' conspiracy to commit the "Bait & Switch" fraud against me. But not for my invisible impairments I would not have been discriminated against when it came to housing. I would have gotten a 2 bedroom unit on the first floor without stairs to climb, I would have my live in aide, and I would be in possession of my rightfully owned and wrongfully taken two bedroom Housing Choice voucher. If I had to use a wheelchair or other visible assistance device for example, the Fraud and other discriminatory acts perpetrated by the defendants on me that included the "undesirable 2nd floor unit on the 2nd floor with steps" that I have now, would have never occurred. **Definition of invisible disabilities**, also known as hidden disabilities, are physical, mental or neurological conditions that aren't noticeable to the outside world. Unlike other disabilities, there are no external indications such as wheelchairs or use of sign language. Because others are unable to see these disabilities, they can lead to people with invisible disabilities being falsely judged or discriminated against.

## 41. CIRCUMSTANTIAL EVIDENCE OF RETALIATION

**Circumstantial evidence** is indirect <u>evidence</u> that does not, on its face, prove a <u>fact in issue</u> but gives rise to a logical inference that the fact exists. For instance, circumstantial evidence of intentional discrimination can include suspicious timing, ambiguous statements, different treatment, personal animus, and other evidence can allow a <u>jury</u> to reasonably infer intentional <u>discrimination</u>. https://www.**law.cornell.edu/** <u>**circumstantial evidence | Wex | US Law**</u>

**Retaliation** is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled "troublemakers." Retaliation, and the fear of retaliation, becomes a potent weapon used to maintain the power structure within the institution. **Ivan E. Bodensteiner, The Risk of Complaining—Retaliation, 38 J.C. & U.L. 1, 1 (2011).**

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact. Direct evidence is evidence of a fact based on a witness's personal knowledge of that fact acquired by means of the witness's senses. Direct evidence may prove guilt of a charged

offense or liability for a civil wrong if, standing alone, that evidence satisfies a jury that guilt of the offense has been proved beyond a reasonable doubt or that liability for a civil wrong has been proven by a preponderance of the evidence or other applicable burden of proof..

Circumstantial evidence is direct evidence of a fact from which a person may reasonably infer the existence or nonexistence of another fact. Circumstantial evidence may prove guilt of a charged offense or liability for a civil wrong, if that evidence, while not directly establishing guilt of the offense or liability for a civil wrong, gives rise to an inference of guilt beyond a reasonable doubt or of liability for the civil wrong by a preponderance of the evidence or other applicable burden of proof.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

42. Even though the Statute Of Limitations has long since expired to be successful in a retaliation action to the events of 2002-2008, I attach exhibits 16, 17, 18, 19 and written testimony as Circumstantial evidence as an additional motive for retaliation, harassment and the unfair treatment against me by the current employees of the Delaware County Housing Authority, Laura Blackburn, Director the co-defendaants of the Delaware County Housing Authority, Ingerman Management Company (IMC) and employees of Ingerman-Concord Pointe. In July of 2002, I was shown an apartment at 339 Hollis St., Crum Lynne, Pa., 19022 by the owner, Vladimir Karpov/Chestnut Hill Realty. The apartment was to be available to me on September 1st, 2002. On or about August 10th, I was told by Mr. Karpov that he had rented the apartment to someone else (a majority-I am a disabled minority) and was in the process of renovating another apartment located at 1146-B Holland St., Crum Lynne, Pa. 19022, that would be equal to the one that was located at Hollis Street. It was not. (Bait and Switch) After signing the lease and moving in, I found that the unit had numerous safety and health violations. He didn't have a Usage and Occupancy permit for that unit as required by Pennsylvania law and HUD so it should not have been in the rental market or a candidate for the Section 8 program, and I complained to my caseworker and to the director of the Section 8 program, Laura Blackburn, to no avail.

43. Due to the inaction and unfair treatment by the DCHA director, Laura Blackburn and the harassing and retaliatory acts by Karpov for me complaining about the conditions of the unit, I had no choice but to file a Complaint (exh 18) on May 24, 2003 to LYNN COX- H.U.D INVESTIGATIONS THE WANAMAKER BUILDING 100 PENN SQUARE EAST PHILADELPHIA, PA. 19107 and move out of the DCHA's jursisdiction. I had been called into Laura Blackburns office and chastised for making the Complaint to HUD. After that I drew up a Mutual Lease Termination Agreement (exh 19) between myself and Karpov, that was eventually granted by the Delaware County Housing Authority.

44. Subsequently, starting in 2005 and ending in 2008 HUD did two audits of the Delaware County Housing Authority's  Section 8 Housing Choice Voucher program and the 2nd was the administration of its Housing Quality Standards inspection program for its Section 8 Housing Choice Program. (exhs -16 and 17). Their findings are included in exhibits 16 & 17.

10

45. Upon learning that I wanted to "port out" (**transfer my Housing Choice Voucher benefit**) from the State of DE to the Delaware County Housing Authority ("DCHA" the respondeat superior), Laura Blackburn, Director, saw this as a golden opportunity for her to give me "payback" (retaliatory acts ) for me reporting alleged wrongful acts/conduct between the Delaware County Housing Authority and my property owners that did business with the DCHA in the year 2003 (exh 15). That Complaint resulted in an investigation by HUD/OIG. Because of the investigation, there were numerous recommendations for changes in the conduct and behavior of the DCHA (exhs-16,17,18,).  Laura Blackburn was also the director then. A secret plan for retaliation against me for "blowing the whistle" or reporting wrongdoings,  was concocted by Laura Blackburn, Director, along with the aid of other employees' (co-conspirators) of the DCHA and along with employees (co-conspirators) of Ingerman-Concord (the respondeat superior)  Pointe who were/are engaged in their own brand of wrongful and punishing activities against me through the use of constant, continuous, ongoing, and non-stop emotional harassment, physical harassment and financial harassment, engaged in the conspiracy intended to cause me much great physical pain and suffering emotional and mental harm. The intent being to oust me along with my Live In Aide, from the Housing Choice Voucher program in retaliation for complaining to the authorities about wrongdoings against me.

11

**The reason(s) for my claims are violations of the following by the defendants', either acting alone or in concert, of :**

1.  **Comment**

"It is the exclusive function of the jury to weigh the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts. . . . Circumstantial and testimonial evidence are indistinguishable insofar as the jury fact-finding function is concerned, and circumstantial evidence can be used to prove any fact." *United States v. Ramirez-Rodriquez*, 552 F.2d 883, 884 (9th Cir. 1977) (quoting *United States v. Nelson*, 419 F.2d 1237, 1239-41 (9th Cir. 1969)). *See also United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976); and *Payne v. Borg*, 982 F.2d 335, 339 (9th Cir. 1992) (citing *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990)).

1.Title 18, U.S.C., Section 241 - Conspiracy Against Rights

Civil Rights Conspiracy Statute - **Section 241** makes it unlawful for two or more persons to agree to injure, threaten, or intimidate an individual in the free exercise or enjoyment of his or her rights.

**Conspiracy is an agreement between two or more people to commit an illegal act, along with an intent to achieve the agreement's goal.** Most U.S. jurisdictions also require an overt act toward furthering the agreement.  An overt act is a statutory requirement, not a constitutional one. See *Whitfield v. United States*, 453 U.S. 209 (2005). The illegal act is the conspiracy's "target offense."

Conspiracy generally carries a penalty on its own.  **In addition, conspiracies allow for derivative liability where conspirators can also be punished for the illegal acts carried out by other members, even if they were not directly involved.**  Thus, where one or more members of the conspiracy committed illegal acts to further the conspiracy's goals, all members of the conspiracy may be held accountable for those acts.

**Conspiracy** against rights is a federal offense in the United States of America under 18 U.S.C. § 241:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person [...] in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;...

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.[1]er constitutionally protected rights.

12

**2. THE FAIR HOUSING ACT TITLE 24 – HOUSING AND URBAN DEVELOPMENT SUBTITLE B - REGULATIONS RELATING TO HOUSING AND URBAN DEVELOPMENT  CHAPTER I - OFFICE OF ASSISTANT SECRETARY FOR EQUAL OPPORTUNITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT PART 100 - DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT**
**Subpart F - Interference, Coercion or Intimidation**
**§ 100.400 Prohibited interference, coercion or intimidation.**
(a) This subpart provides the Department's interpretation of the conduct that is unlawful under section 818 of the Fair Housing Act.
(b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this part.
(c) **Conduct made unlawful under this section includes**, but is not limited to, the following:
(1) **Coercing a person**, either orally, in writing, or **by other means**, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, religion, sex, **handicap,** familial status, or national origin.
(2) Threatening, intimidating or **interfering** with persons in their enjoyment of a dwelling because of the race, color, religion, sex, **handicap,** familial status, or national origin of such persons, or of visitors or associates of such persons.
(5) **Retaliating against any person because that person has made a complaint,** testified, assisted, **or participated in any manner in a proceeding under the Fair Housing Act.**

**3. TITLE 24 §982.316(b)(1,2,3)   LIVE-IN AIDE.**
(b) At any time, the PHA may refuse to approve a particular person as a live-in aide, or may withdraw such approval, **if:**
(1) The person commits fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;
(2) The person commits drug-related criminal activity or violent criminal activity;
(3) The person currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act.

With the exception of the defendants' **there were no violations of this Title** by me nor was I or my live in aide accused of any.

**4. Title III of the Americans with Disabilities Act of 1990** (ADA) prohibits discrimination on the basis of disability in places of public accommodation (42 U.S.C. § 12182(a)).

**The ADA does not stipulate that a disability has to be visible for a person to receive protection** from discrimination. Oftentimes, people with invisible disabilities face discrimination because there are many false assumptions about needed accommodations for this subset of the population. **They have the same legal rights as other people with disabilities – rights to access, accommodations, and they are not to be discriminated against based on their disability.**

**5. "Bait & Switch" tactics are in violation of 15 USC CHAPTER 2, SUBCHAPTER I:
FEDERAL TRADE COMMISSION**

§45. Unfair methods of competition unlawful;

**(a)** Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign
trade

(1) Unfair methods of competition in or affecting commerce, **and unfair or deceptive acts or
practices in or affecting commerce, are hereby declared unlawful.**

(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or
corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this
title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to
the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle
VII of title 49, and persons, partnerships, or corporations insofar as they are subject to the
Packers and Stockyards Act, 1921, as amended [7 U.S.C. 181 et seq.], except as provided in
section 406(b) of said Act [7 U.S.C. 227(b)], from using unfair methods of competition in or
affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

**6. Federal Trade Commission Act
Section 5: Unfair or Deceptive Acts or Practices
Deceptive Practices
An act or practice is deceptive where a representation, omission, or practice misleads
or is likely to mislead the consumer;** a consumer's interpretation of the representation,
omission, or practice is considered reasonable under the circumstances; and the misleading
representation, omission, or practice is material.

**7. 73 P.S. §§201-1 - 201-9.2
PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW §201-2**

(4) "Unfair methods of competition" and **"unfair or deceptive acts or practices" mean any one
or more of the following:**
**(ix) Advertising goods or services with intent not to sell them as
advertised; aka "Bait & Switch".**

**8. 18 U.S. Code § 2261A – Stalking**

Whoever— (1) **travels in interstate** or foreign commerce or is present within the special
maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, **with
the intent to** kill, injure, **harass, intimidate,** or place under surveillance with intent to kill,
injure, harass, or intimidate another person, **and in the course of, or as a result of, such travel
or presence engages in conduct that—** (A) places that person in reasonable fear of the death of,
or serious bodily injury to— (i) that person;(ii) an immediate family member (as defined in
section 115) of that person;(iii) a spouse or intimate partner of that person; or(iv) the pet, service
animal, emotional support animal, or horse of that person; or

**(B)**
**causes, attempts to cause, or would be reasonably expected to cause substantial emotional
distress to a person described in clause (i),** (ii), or (iii) of subparagraph (A);
shall be punished as provided in section 2261(b) or section 2261B, as the case may be.

## 9. THE TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The tort of intentional infliction of emotional distress (IIED) occurs when one acts abominably or outrageously with intent to cause another to suffer severe emotional distress, such as issuing the threat of future harm.

*Exh 1*

easee2@gmail.com

| | |
|---|---|
| **From:** | Birchwood at Concord <concordasst@ingerman.com> |
| **Sent:** | Wednesday, September 18, 2019 3:14 PM |
| **To:** | easee2@gmail.com |
| **Subject:** | Now Leasing: 2 Bedrooms in Glenn Mills |

2 Bedroom Apartments Available Now!

View this email in your browser



# Take a Tour of Birchwood at Concord!

We have 2 Bedroom Apartments Available for $1,013/mo.

The well-appointed apartments at our **55+ active adult community**, Birchwood at Concord, offer modern kitchens, central air, private entrances, spacious floorplan layouts and are pet-friendly.

The community offers maintenance-free living, a lounge, parking, laundry facilities, and on-site management.

Contact us today to set up a tour!

1112 Smithbridge Road | Glenn Mills, PA 19342
(610) 558-3789 | Email

*\*Affordable senior housing, age and income restrictions apply. Ask manager for more information.*

 

*Exh 2*

# Voucher
## Housing Choice Voucher Program

**U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing**

OMB No. 2577-0169
(exp. 07/31/2022)

Public Reporting Burden for this collection of information is estimated to average 0.05 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. Assurances of confidentiality are not provided under this collection. This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program.

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names is mandatory. The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family voucher issuance.

| | |
|---|---|
| Please read entire document before completing form<br>Fill in all blanks below. Type or print clearly. | Voucher Number<br>**t1002405** |
| 1. Insert unit size in number of bedrooms. (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.) | 1. Unit Size<br>**2** |
| 2. Date Voucher Issued (mm/dd/yyyy)<br>Insert actual date the Voucher is issued to the Family. | 2. Issue Date (mm/dd/yyyy)<br>**10/04/2019** |
| 3. Date Voucher Expires (mm/dd/yyyy) must be at least sixty days after date issued.<br>Voucher is issued. (See Section 6 of this form.) | 3. Expiration Date  (mm/dd/yyyy)<br>**02/01/2020** |
| 4. Date Extension Expires (if applicable)(mm/dd/yyyy)<br>(See Section 6. of this form) | 4. Date Extension Expires (mm/dd/yyyy)<br>**No Extension** |

| 5. Name of Family Representative<br>**Earlando Samuel** | 6. Signature of Family Representative | Date Signed (mm/dd/yyyy)<br>10 - 7 - 19 |
|---|---|---|

| 7. Name of Public Housing Agency (PHA)   **New Castle County** | | |
|---|---|---|
| 8. Name and Title of PHA Official<br>**Sharonda Spencer** | 9. Signature of PHA Official | Date Signed (mm/dd/yyyy)<br>10-4-2019 |

**1. Housing Choice Voucher Program**

A.   The public housing agency (PHA) has determined that the above named family (item 5) is eligible to participate in the housing choice voucher program. Under this program, the family chooses a decent, safe and sanitary unit to live in. If the owner agrees to lease the unit to the family under the housing choice voucher program, and, if the PHA approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

B.   The PHA determines the amount of the monthly housing assistance payment to be paid to the owner. Generally, the monthly housing assistance payment by the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income. In determining the maximum initial housing assistance payment for the family, the PHA will use the payment standard in effect on the date the tenancy is approved by the PHA. The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of the PHA's assistance payment. The actual amount of the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.

**2. Voucher**

A.   When issuing this voucher the PHA expects that if the family finds an approvable unit, the PHA will have the money available to enter into a HAP contract with the owner. However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy. The PHA does not have any liability to any party by the issuance of this voucher.

B.   The voucher does not give the family any right to participate in the PHA's housing choice voucher program. The family becomes a participant in the PHA's housing choice voucher program when the HAP contract between the PHA and the owner takes effect.

C.   During the initial or any extended term of this voucher, the PHA may require the family to report progress in leasing a unit at such intervals and times as determined by the PHA.

Previous editions obsolete                    Page 1 of 3                    form HUD-52646 (07/2019)

2

**Voucher**
**Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing**

OMB No. 2577-0169
(exp. 07/31/2022)

Public Reporting Burden for this collection of information is estimated to average 0.05 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. Assurances of confidentiality are not provided under this collection. This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program.

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names is mandatory. The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family voucher issuance.

| | |
|---|---|
| Please read **entire** document before completing form. Fill in all blanks below. Type or print clearly. | Voucher Number<br>t0062117 |
| 1. Insert **unit size** in number of bedrooms. (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.) | 1. Unit Size<br>1 |
| 2. **Date Voucher Issued (mm/dd/yyyy)**<br>Insert actual date the Voucher is issued to the Family. | 2. Issue Date (mm/dd/yyyy)<br>10/04/2019 |
| 3. **Date Voucher Expires (mm/dd/yyyy)** must be at least sixty days after date issued.<br>Voucher is issued. (See Section 6 of this form.) | 3. Expiration Date (mm/dd/yyyy)<br>12/03/2019 |
| 4. **Date Extension Expires** (if applicable)(mm/dd/yyyy)<br>(See Section 6. of this form) | 4. Date Extension Expires (mm/dd/yyyy) |
| 5. Name of Family Representative<br>**EARLANDO SAMUEL** | 6. Signature of Family Representative<br>*Earlando Samuel* ?? | Date Signed (mm/dd/yyyy)<br>11-5-19 |
| 7. Name of Public Housing Agency (PHA)<br>**Delaware County Housing Authority** | | |
| 8. Name and Title of PHA Official<br>**Laura D Blackburn, Director** | 9. Signature of PHA Official<br>*L. Ware* | Date Signed (mm/dd/yyyy)<br>11/5/19 |

**1. Housing Choice Voucher Program**

A. The public housing agency (PHA) has determined that the above named family (item 5) is eligible to participate in the housing choice voucher program. Under this program, the family chooses a decent, safe and sanitary unit to live in. If the owner agrees to lease the unit to the family under the housing choice voucher program, and if the PHA approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

B. The PHA determines the amount of the monthly housing assistance payment to be paid to the owner. Generally, the monthly housing assistance payment by the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income. In determining the maximum initial housing assistance payment for the family, the PHA will use the payment standard in effect on the date the tenancy is approved by the PHA. The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of the PHA's assistance payment. The actual amount of the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.

**2. Voucher**

A. When issuing this voucher the PHA expects that if the family finds an approvable unit, the PHA will have the money available to enter into a HAP contract with the owner. However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy. The PHA does not have any liability to any party by the issuance of this voucher.

B. The voucher does not give the family any right to participate in the PHA's housing choice voucher program. The family becomes a participant in the PHA's housing choice voucher program when the HAP contract between the PHA and the owner takes effect.

C. During the initial or any extended term of this voucher, the PHA may require the family to report progress in leasing a unit at such intervals and times as determined by the PHA.

Fabricated !!

Date: July 15, 2020

Rashida Smith, Property Manager
Birchwood At Concord Pointe
Concord Pointe Senior Associates
452 Parker Place
Glen Mills, PA 19342
concordasst@ingerman.com
610 558 3789 – Phone
610 358 1039 – Fax

Dear Mam;

On or about April 1, 2020 when I was in your office to pay my rent, you informed me that
I had to turn my T V off at 10:30 P M without an explanation as to why. Since then it has
come to my attention that a Mr. Nicholas Capasso, my neighbor at 206 Parker Place,
had made some type of noise complaint to you about being able to ""hear" my T V. The
audio range settings on my T V are from 1 to 40. I keep it around 7 or 8 which gives a
decibel level of 43.7, the level of a quiet library. This was not a typical noise complaint
where there is excessive loudness but a nuisance complaint made to harass. Noise
complaints are investigated by Law Enforcement. There was none.

Prior to that date, Mr. Capasso had been harassing me by:
　　1. following me around outside after hearing  me coming down my stairs to go
outside (some of the stairs are loose and make noise when weight is put on them),
　　2, making false allegations against me, such as me throwing bread out to feed birds
(he is the one that I visually saw doing that) and his noise complaint,
　　3. spewing forth hateful rhetoric to me about the women's lifestyles  that live at 205
and 208 Parker Place.
　　4. also he complained to me about being able to "hear" their lovemaking sounds
throughout the night  On several occasions I had to tell him to get away from me with
that type of rhetoric, and
　　5. out of the kindness of her heart and as a neighborly gesture of friendliness, Mary
B.  that lives at 205 Parker Place, decorated my front lawn area. That same night, my
front lawn was mysteriously vandalized.  I questioned my neighbor Debra G. in unit 208,
whom BTW trembles out of fear at the mere mention of Mr Capasso, **no one should
have to live in fear,** as to whether or not she saw anything suspicious. She hadn't.
Before that incident and earlier that day I was stopped mid-stride and questioned by Mr.
Capasso about whether or not I had done the decorations.

BTW I have observed Mr. Capasso carrying a baseball bat on the property. Does he
play baseball or is the bat displayed to intimidate? It is my understanding that, and as
you know, Mr. Capasso has numerous complaints against him and that there have been
several attempts to get him evicted to no avail. On information and belief and as you

Exh 4

know, he has **prejudices towards certain people because of a particular aspect of their identity** which is o k with me. I'm not into the black and white thing, I'm into the Earlando Samuel thing. This is a country where he is free to believe in whatever he wants. But I am curious as to why would Concord Pointe Apts. place a person of color above a person that is a known troublemaker whom harbors such anger and prejudicial behaviors. That is a recipe for disaster.

In the spirit of being neighborly I didn't see a reason to make a formal complaint against him then or now. I was brought up men settled these types of things amongst themselves and also he hasn't bothered me since you imposed your "curfew" on me.

Moving forward on July 6, 2020 at approximately 5:15 p m a letter from the Concord Pointe Management and Maintenance Team was placed on my door stating that there would be a "**MANDATORY pre-inspection**" for an upcoming Township inspection of my unit. I was awoken at around 9:10 the next morning to maintenance walking around in my home without me letting him in. I was in bed and didn't have a mask on or had taken any other precautions against the Covid-19 pandemic that is raging through this county. Was maintenance tested for the virus before entering my unit? What were their results? To this date I still have an headache(s) due to the great alarm created from that encounter.  In the past, I have been treated for the symptoms of PTSD and now they are back. I need to know the authority that gives you the right to do a "**MANDATORY pre-inspection**" of my unit.

On July 8, 2020 another letter was placed on my door from the Concord Pointe Management and Maintenance Team stating that "we have canceled the upcoming township safety inspection"....." due to the spike in Covid-19 cases". . Your "**MANDATORY pre-inspection**" was pointless, illegal and intrusive.  I believe that there is an underlying animus. In regards to the wrongful 10:30 "curfew" that was placed on me **you do nothing to the wrongdoer but you punish the victim !**  Does that sound familiar to you? Is that fair? BTW I'm 68 not 6 or 8 years old! You leave me with no choices but do everything in my power(s) to protect my rights, myself and my interests

Sincerely;

Earlando Samuel
207 Parker Place
Glen Mills PA 19342
302 423 2963
610 241 7537
easee2@gmail.com

cc/file/folder/ingerman
Fax: 856.665.7178?

*Exh 5*

easee2@gmail.com

| | |
|---|---|
| **From:** | concordasst@Livebirchwood.com |
| **Sent:** | Wednesday, March 24, 2021 3:29 PM |
| **To:** | Earl |
| **Subject:** | RE: HAP |

Good Afternoon,

Thank you for following up and I do apologize for not getting back to you sooner. I did receive an email from your case worker. It seems as if they didn't make the payments for you for those months ( February/ March), but they did make the payments this month for those 2 month. I'm guessing someone was out of the office due to Covid or something happened on their end. As far as January's payment, we actually did receive that. Our accounting depart actually notified me of that yesterday. So you are now in good standing.

**Terri Hardin**
*Office Assistant*
**p** 610-558-3789
**f** 610-358-1039
www.ingerman.com

452 Parker Place
Glenn Mills, PA 19342

-----Original Message-----
From: Earl <easee2@gmail.com>
Sent: Wednesday, March 24, 2021 10:54 AM
To: Concord Asst <concordasst@Livebirchwood.com>
Subject: HAP

Hi Terri...This is a follow up in regards to my almost three month late Housing Assistance Payment from the DCHA that Ingerman Concord Pointe was having an issue with. Has that been resolved? Thanks in advance.....Earlando Samuel.

*Exh 6*



**pennsylvania**
OFFICE OF STATE
INSPECTOR GENERAL

July 30, 2021

*via email only* easee2@gmail.com

Earlando Samuel
207 Parker Place
Glen Mills, PA 19342

**Re:    Complaint to the Pennsylvania Office of State Inspector General**

Dear Mr. Samuel:

Thank you for contacting the Pennsylvania Office of State Inspector General (OSIG).  The OSIG is in receipt of your online complaint dated July 27, 2021 regarding matters involving Christina Pro of the Delaware County Housing Authority.  The OSIG's mission is to deter, detect, prevent, and eradicate fraud, waste, misconduct, and abuse in the programs, operations, and contracting of executive agencies under the Governor's jurisdiction.

After its review, the OSIG has determined the issues raised in your complaint are not within its jurisdiction.  The OSIG referred your complaint to the Department of Housing and Urban Development.  You may wish to file a complaint with the Office of Inspector General, United States Department of Housing and Urban Development at https://www.hudoig.gov/fraud/what-you-can-do.

Sincerely,

Steven E. Bear
Deputy State Inspector General
Bureau of Special Investigations

6

Exh 7

Date: August 18, 2021

RASHIDA SMITH → Nefertiti Rivers
SENIOR PROPERTY MANAGER
INGERMAN BIRCHWOOD
AT RODNEY COURT
WILMINGTON, DE 19806
302-654-9113
302-656-0895
rodneycourt@Livebirchwood

TERRI HARDIN, ASSISTANT
PROPERTY MANAGER
INGERMAN BIRCHWOOD
AT CONCORD POINTE
452 PARKER PLACE
GLEN MILLS PA 19342
610 558 3789  610 358 1039
concordasst@Livebirchwood.com

INGERMAN
5 POWELL LANE
COLLINGSWOOD, NEW JERSEY 08108
856 662  1730
info@ingerman.com

## CEASE AND DESIST ORDER
### FROM RIGHT OF ENTRY VIOLATIONS AND HARASSMENT:

**This 2nd and my FINAL CEASE AND DESIST order** is to inform you that the following persistent actions by yourself, Terri Hardin,  and Greg Ward, maintenance manager,  including but not limited to using your master key to enter my home without my consent or permission, using your master key to let others into my home without my permission or consent, entering my home without giving me due notice when I haven't requested any repairs have become unbearable.

This is not to be misconstrued as to me unreasonably withholding consent for you to provide me with the needed and appreciated services but the ongoing right of entry and privacy violations that I have to endure ever since the illegal "Bait & Switch" scheme of September 2019 that I'm a victim of perpetrated by employee's of Ingerman.  Also, amongst other things,  I lost my 2 (two) bedroom Housing Choice Voucher as a result of this wrongful activity (Bait and **switch** tactics are **illegal** in the United States and are in violation of the Federal Trade Commission and Delaware and Pennsylvania Deceptive Trade Practice Laws).

In furtherance of the defendants' scheme to cover up wrongdoings, Greg Ward, maintenance manager along with Terri Hardin, asst. manager of  the Ingerman Concord Pointe Senior in Glem Mills, Pa., entered into a campaign with a clear intent to repeatedly harass, annoy, create great alarm, and frighten me. The campaign worked very well to the point that I am awake most of the night, I get continuous and constant headaches, etc.

1

The following are just two examples of what I have to endure:

On 7 6 '20 at approximately 5:20 pm I heard a knock on my front door. Someone attached a note to my door that I would have a "mandatory pre-inspection" starting the next day. I was awakened at 9:30 am the next morning by Greg the maintenance manager hollering. He had used his master key to enter my home and without giving the proper 48 hour notice I addressed this in a letter dated 7 15 '20 to Rashida Smith. She replied with a "it won't happen again".. In this letter I noted to Rashida that I had been treated for some of the symptoms of Post-Traumatic Stress Disorder.

Two mornings later it happened again while I was in my bedroom and without any notice and not making any sounds or noises, Greg Ward entered my apartment under the guise of having to replace the bulb in the oven. The oven was new when I moved into the unit and I may have used the light twice. I use a NuWave air fryer, not the oven due to the high cost of propane. After awakening me, he told me about the bulb. That had the same effect as if someone sneaked up on me and hollered "BOO"

The most recent act of harassing behavior was on or about June 20 2021. It was approximately 9:30 am. I heard voices and laughter coming from downstairs my stairwell. I rushed out of my bedroom half-dressed to find Greg Ward, Terri Hardin and an unknown woman coming up the stairs. I hollered to them that I was half dressed and asked them what were the doing in my home. Greg Ward replied that it was an air filter check. They came on up the stairs, looked around and in the direction of my WyzeCam and left without checking the heater air filter.

I am required through my HAP contract that supersedes Ingerman Concord Pointe Senior's lease, to have only **one annual inspection done by the Delaware County Housing Authority inspection** department that requires entry into my home unless inspections are required by the County or other State agencies. Between mowing into this upstairs unit and to date, I have had 5 "mandatory pre inspection inspections" and 4 Ingerman Concord Pointe quarterly inspections done by Greg Ward, maintenance manager. I've always notified Greg Ward, maintenance if I have had any maintenance issues in the past.

In the past whenever there are inspections or needed entry by individuals other than employees' from Ingerman, upon timely notice of the date I would unlock my door early in the morning and whenever the individual rang the doorbell or knocked I would tell them to come in. Simple and Civil.

You are **ORDERED TO STOP these activities** put in place to repeatedly harass, annoy, create great alarm, and frighten me immediately as they are being done in violation of the law as you know causing me tremendous amounts of emotional distress.

I have the right to remain free from these activities as they constitute privacy violations, harassment, trespassing and landlord retaliation, and I will pursue any legal remedies available to me against you if these activities continue. These remedies include but are not limited to: contacting law enforcement to obtain criminal sanctions against the offenders, and suing you civilly for damages I have incurred as a result of these actions. ~~Title 18 Crimes and Offenses~~ ~~Harassment. [...] commits the crime of harassment~~ ~~[...] with intent to harass, annoy or alarm [...] no person [...]~~

Rashida Smith, Greg Ward and Terri Hardin are residents of the State of Delaware. Because the defendants' wrongful harassing behaviors crossed State lines into Pennsylvania, their

Exh 7

behavior(s) meet the definitions found in Federal Stalking and Harassment Laws. (When harassing or stalking behavior involves the internet, U S mail or activities that cross State lines, the crime may be charged as a Federal offense.)

At this time, I am not contacting the authorities as I hope we can resolve this matter without authoritative involvement. I am not under any circumstances, however, waiving any legal rights I have presently, or future legal remedies against you by sending you this letter. This order acts as **ONE FINAL CHANCE** for you, the owner(s) (you are the **respondeat superior** which means that you are responsible for the acts of commission and omission of an agent, employee, or subordinate, performed within the scope of his or her duties) to cease these illegal activities..

Sincerely,

Earlando Samuel
207 Parker Place
Glem Mills PA 19342
easee2@gmail.com

Exh 8

easee2@gmail.com

| | |
|---|---|
| **From:** | LAURA BLACKBURN <ldblackburn@dcha1.org> |
| **Sent:** | Monday, August 09, 2021 2:48 PM |
| **To:** | Earl |
| **Cc:** | DOUG WATTS; JULIE MARDER |
| **Subject:** | RE: Earlando Samuel - Informal Hearing |

Mr. Earlando Samuel,

Thank You for those kind words.

Not sure about the 1-bedroom Voucher vs. the Two bedroom, if you require a live-in aid, you will need to provide documentation from a medical professional stating you need a live-in aide.

You will then need to submit the information on the live in in ( i.e., Name, Birth Certification, Picture Identification, Verification of Income, and bank accounts.  - We will then have the live-in aid sign an authorization from so a Criminal Background and Megan's law check can be conducted.

If the live-in aide meets all eligibility requirements we can then proceed with the following:

As for the 1 Br. Voucher vs. the Two Bedroom Voucher, you will need to read your lease and give proper notice to your landlord of your intent to vacate.  We will need a letter from the owner stating you are currently in compliance (i.e., rent is up to date, no lease violations and proper notice was given.)

Upon receipt of the clearance letter a two Bedroom Voucher will be issued.

The above procedure is for all clients who ask to have a live-in aide, and or who wishes to move.


Thank you

Laura D. Blackburn, PHM; SHM



*Exh 8*

**Subject: FW: Earlando Samuel - Informal Hearing**

Hi Laura...It's been awhile. Since 2002 when I lived at 1146 Holland Ave in Crum Lynne. It was great to see you at my intake. BTW what you and the DCHA have done with that property is amazing. Actually the positive impact that the DCHA has on the community(s) in Delaware County is a model for the other PHA's in this region to follow. Great job Laura!!

Anyway this is a communication between myself and Christin Pro in regards to my two bedroom voucher (attached) that I'm alleging was wrongfully taken from me. The only way that I could lose that 2 bedroom voucher is if I am in violation of 24 CFR 982.316(b)]:
The person commits fraud, bribery or any other corrupt or criminal act in connection with any federal housing program; The person commits drug-related criminal activity or violent criminal activity; or The person currently owes rent or other amounts to DCHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act. I'm not.

I moved here from a two bedroom unit with my son as my live in aide. I was tricked into moving into the one bedroom unit through a illegal "Bait & Switch" scheme put together by wrongdoers in the NCCHA and others. There is a civil action pending in regards to that matter. If I had my way I wouldn't have moved here. I'm the only black man that has ever lived in this community and there is a lot of resentment aimed at me, the maintenance man here is an informant that engages in surprise "pre inspection inspections"
to gather info, etc., etc..

Christina Pro says that each housing authority has its' own administrative plan. That may be true but it doesn't supersede the Code Of Federal Regulations. The Code of Federal Regulations (CFR) is a codification of the general and permanent rules published in the Federal Register by the executive departments and agencies of the federal government.

As a retaliatory act, the then Director of the NCCHA did the same thing that has been done to me by the DCHA in regards to the voucher. He downgraded it to a one bedroom voucher. My two bedroom was reinstated

and returned to me through the Attorney Generals' Office for the State Of Delaware.

I'm in need of an Aide especially now. Would you take a look into this. I hope that this can be resolved at this level. Thanks in advance and take care.....

-----Original Message-----
From: Earl [mailto:easee2@gmail.com]
Sent: Friday, August 06, 2021 6:16 PM
To: 'CHRISTINA PRO'
Subject: RE: Earlando Samuel - Informal Hearing

Very Good !

-----Original Message-----
From: CHRISTINA PRO [mailto:christinap@dcha1.org]
Sent: Friday, August 06, 2021 9:43 AM
To: Earl
Subject: RE: Earlando Samuel - Informal Hearing

Mr. Samuel,

All though you came into our Housing Authority with a 2-bedroom voucher DCHA's policy states you are only entitled to a 1 bedroom. Each Housing Authority has their own administration plan. Your unit is only 1 bedroom. If you decide to add a live-in aide  and your voucher is increased to a 2 bedroom then you would need to move.
We cannot pay for the payment standard for a 2 bedroom on a 1-bedroom unit.
Please see DCHA'S policy on Live-in aides below. Please keep in mind that we will also need to run a background check on anyone moving into the unit.

3-I.M. LIVE-IN AIDE
Live-in aide means a person who resides with one or more elderly persons, or near-elderly persons, or persons with disabilities, and who: (1) is determined to be essential to the care and well-being of the persons, (2) is

## Birchwood
◀ AN INGERMAN SENIOR COMMUNITY ▶

*Exh 9*

*Recvd. 10-28 '21*

**Birchwood at Concord Pointe**
452 Parker Place
Glen Mills, PA 19342
concordasst@ingerman.com
610-558-3789 phone
610-358-1039 fax

# Completing your Self-Certification

## Summary:

Enclosed in this envelope is the paperwork for your yearly certification. This certification is your annual self-certification and does not require any income or asset verification, as you have previously been required to provide in a full certification.

You are just signing the highlighted area! Please follow the instructions below to complete your certification and drop off your paperwork in the locked office drop box when completed.

Additionally, an example certification packet is attached to assist you in completing the paperwork.

## Documents Enclosed:

<u>Please print your responses unless requested otherwise and call the office with any questions you have during this process!</u>

**1) STUDENT QUESTIONAIIRE (2 Pages)**

a) The Student Questionnaire is required to be completed annually, to confirm that you are not currently student due to conflicts with student financial aid and scholarships, and affordable housing properties such as this one.

b) **FIRST PAGE** [Please complete only the following]
   i) **Applicant/Resident:** *First Name Last Name* (Bailey McCann)
   ii) **Date:** *Today's Date* (3/19/2020)
   iii) **Property:** *Concord Pointe*
   iv) **Are you student at an institution of higher education?:** *Check "No"*

c) **SECOND PAGE** [Please complete only the following]
   i) **Print Name:** *First Name Last Name (Bailey McCann)*
   ii) **Signature:** *Sign your Full Name*
   iii) **Date:** *Today's Date* (3/19/2020)

*9*

# TENANT INCOME CERTIFICATION

### Alternate Certification

| | |
|---|---|
| Effective Date: | 11/01/2021 |
| Move-in Date: | 11/27/2019 |
| Current Date: | 10/28/2021 |

## Part I - DEVELOPMENT DATA

Property Name: Concord Pointe Senior Associates, L        County: Delaware                                TC#: 1999-0066

Address: 201-208 Parker Place; Concord, PA, 19342        BIN#: PA99-03066        Unit Number: 207        # Bedrooms: 1

## Part II - HOUSEHOLD COMPOSITION

| HH Mbr # | Last Name | First Name & Middle Initial | Rel HH | Race * | Ethn * | Dsbd * | Gndr * | Date of Birth * | F/T Student | Social Security or Alien Reg. No. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Samuel | Earlando | H | 3 | N | N | M | 01/24/1952 | N | 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 |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |

* Indicates responses are optional and intended for statistical use only.

| (L) Total Annual Household Income | 9,720.82 |
|---|---|

## HOUSEHOLD CERTIFICATION & SIGNATURES

The information on this form will be used to determine tax credit eligibility. I/We agree to notify the landlord immediately upon any new member moving in.

Under penalties of perjury, I/We certify that the information presented in this Certification is true and accurate to the best of my/our knowledge and belief. The undersigned further understands that providing false representations herein constitutes an act of fraud. False, misleading, or incomplete information may result in the termination of the lease agreement, with the exception of responses that are identified as optional.

_Earlando Samuel_        11-1-2021

Signature                                                              Date

## Part VI - RENT

| | |
|---|---|
| Tenant Paid Rent | 16.00 |
| Utility Allowance | 132.00 |
| GROSS RENT FOR UNIT: (Tenant paid rent plus Utility allowance & Other non-optional charges) | 148.00 |
| Maximum Rent Limit for this Unit: | 906.00 |

| | |
|---|---|
| Rental Assistance Type | Tenant Based |
| Rental Assistance | 695.00 |
| Other non-optional charges | 0.00 |

Unit Meets Rent Restriction at:
☐ 60%   ☑ 50%   ☐ 40%   ☐ 30%   ☐ 20%

## Part VII - STUDENT STATUS

ARE ALL OCCUPANTS FULL-TIME STUDENTS?

If yes, enter student explanation* (also attach documentation)

☐ Yes   ☑ No

*Student Explanation:
0 – N/A Year 16 – 30
1 – TANF assistance
2 – Job Training Program
3 – Single parent/dependent child
4 – Married/joint return
5 – Foster Care

## SIGNATURE OF OWNER/REPRESENTATIVE

Based on the representations herein and upon the proofs and documentation required to be submitted, the individual(s) named in part II of this Tenant Income Certification is/are eligible under the provisions of Section 42 of the Internal Revenue Code, as amended, and the Land Use Restriction Agreement (if applicable), to live in a unit in this property.

_____        _____
Signature of Owner/Representative                    Date

*Exh 10*

 **Ingerman**

5 Powell Lane
Collingswood, NJ 08108
T 856.662.1730
F 856.665.7178

www.ingerman.com

**NOTICE OF DELIQUENT RENT**

Date: *1/18/2022*     *Recvd. 1-20-'22*

*Earlando Samuel*

452 Parker Place
Glen Mills, PA 19342     *Unit 207*

RE: Notice to Cure Delinquent Rent Amount Owed: $ *129.00*

Dear Resident(s):

Please be advised that you owe rent as required in your Lease, in the above amount and the total amount of

$ *129.00* is now overdue.  Your monthly rent is $ *59.00*. An itemized breakdown of the total amount is as
follows:                                         *$16.00     11-1-2021*

  i.     Balance of rent for the month of *Nov + Dec* in the amount of $ *70.00* ;   *Re-cert*

  ii.    Rent for the month(s) of *59.00* in the amount of $ *Jan.* per month:

You have five (5) business days from the mailing or hand delivery of this notice to make payment in full.

Federal and State Regulations currently in effect do not forgive or excuse your obligation to pay rent.  In the event you
fail to pay your rent, your Landlord will pursue remedies to the extent permitted by law.  If you have been directly
affected by COVID-19 and have suffered a negative financial impact, please contact Management to discuss payment
options.  If you have any other questions, please contact the Management Office.

Sincerely,

Nefertiti Rivers
Property Manager

*10*

DEVELOPMENT  •  CONSTRUCTION  •  PROPERTY MANAGEMENT

*Exh 11*



**Ingerman**

5 Powell Lane
Collingswood, NJ 08108
T 856.662.1730
F 856.665.7178

www.ingerman.com

**NOTICE OF DELIQUENT RENT**

Date: 1/18/2022        *Rec'vd: 1-20-'22*

Earlando Samuel

452 Parker Place
Glen Mills, PA 19342        *Unit 207*

RE: Notice to Cure Delinquent Rent Amount Owed: $ *129.00*

Dear Resident(s):

Please be advised that you owe rent as required in your Lease, in the above amount and the total amount of

$ *129.00* is now overdue. Your monthly rent is $ *59.00* An itemized breakdown of the total amount is as follows:

*$16.00   11-1-2021*

   i.    Balance of rent for the month of *Nov + Dec* in the amount of $ *70.00* ;   *Re-cert*

   ii.   Rent for the month(s) of *59.00* in the amount of $ *Jan.* per month:

You have five (5) business days from the mailing or hand delivery of this notice to make payment in full.

Federal and State Regulations currently in effect do not forgive or excuse your obligation to pay rent. In the event you fail to pay your rent, your Landlord will pursue remedies to the extent permitted by law. If you have been directly affected by COVID-19 and have suffered a negative financial impact, please contact Management to discuss payment options. If you have any other questions, please contact the Management Office.

Sincerely,

Nefertiti Rivers
Property Manager

11

*Exh 12*

## FIVE DAY NOTICE OF DELINQUENT RENT

DATE 04/11/2022

Regular Mail with Proof of Mailing ~ *untrace*

Earlando Samuel
207 Parker Place
Glen Mills PA 19342

**RE:**   **Five day notice to Cure Delinquent rent and other charges**
**Amount owed: $ 248.00**

Dear Resident,

Please be advised that you owe rent and other charges as required in your Lease, which provides your monthly rental amount is **$248.00** The total amount currently due is listed above. This amount consists of:

| | |
|---|---|
| Current month's rental balance | $22.00 |
| Current late fee | $50.00 |
| Previous rental balance | $176.00 (August 2021-March 2022) |
| Total | $248.00 |

You have five (5) business days from the mailing or hand delivery of this notice to make payment in full.   Your failure to pay the rent and other charges within this time period **shall result in your landlord immediately terminating your rental agreement** on the day after the five day period expires.  This continued breach will also result in the immediate filing of an action for Summary Possession of the rented premises in a Justice of the Peace Court based upon your failure to cure the default.

### HOLDOVER

In the event you fail to pay all rent due within the five (5) day period, and the rental agreement is therefore terminated you will then have no legal right to remain in the rental property.  At that point, if you fail to vacate you will be considered a holdover tenant.  Under the Residential Landlord Tenant Code, a holdover tenant is responsible for double rent for every day they remain in the unit after the agreement has expired or has been terminated. (See §5515 of the Residential Code). **As your landlord we will actively seek to recover holdover rent of double the per diem amount as is set forth in your rental agreement and in the Residential Landlord Tenant Code.** In addition, the Court may hold you responsible for any further losses incurred by the landlord as a result of your holdover.

### RESERVATION OF RIGHTS

If you make a partial payment or if you make a full payment of the amount set forth above after the five (5) day period to cure has expired the landlord will accept the payment subject to a full reservation of rights.  Any payment you make will be applied to your balance and an action for Summary Possession will be filed based upon your breach of the rental agreement.  Such a payment will not stop holdover rent from accruing.  **Acceptance of the payment is with reservation of all rights and remedies available to your landlord under** title 25 **Del. C.** § 5101 et seq, and **does not** constitute a waiver of any of your landlord's rights.  **Thus this acceptance of rent with a reservation of rights does not constitute a renewal of the rental agreement nor does it create a new rental agreement**

Should you have any questions, please call our office at 610-558-3789

Sincerely,

Nefertiti Rivers – Property Manager

*12*

*I recvd. from Nefertiti on 4·12·'22 - my only Exh 13 Notification*

## Section 8 Housing Voucher Program - Notice of change to Lease and Contract

03/10/2022
Tenant Code: t0062117

EARLANDO SAMUEL
207 PARKER PLACE
GLEN MILLS, PA 19342

The contract dated 12/01/2019, entered into between the Owner, CONCORD POINTE SENIOR ASSC. L.P., and the PHA, Delaware County Housing Authority and the LESSEE ('FAMILY'), EARLANDO SAMUEL(t0062117) for the following described unit TAG149 located at 207 PARKER PLACE, GLEN MILLS, PA 19342 is amended as follows:

**The reason for this change is due to:**

[ ] **REEXAMINATION**
    Annual Review of family income and/or composition.

[X] **INTERIM ADJUSTMENT**
    Interim change in family income and/or composition.

[ ] **RENT ADJUSTMENT**
    The owner/agent request for a rent adjustment.

[ ] **CHANGE IN FAMILY COMPOSITION**

| Adjustment in Payment | From | TO |
|---|---|---|
| HAP Payment | $652 | $630 |
| Tenant Rent | $59 | $81 |
| Total Rent to Owner | $711 | $711 |
| URP | $0 | $0 |

**Effective Date**
This change to the Housing Voucher Contract and/or Lease Agreement will be effective from 08/01/2021.  The next reexamination is due on 12/01/2021.

This change is presented to you in accordance with the terms and conditions of the Housing Voucher Contract and/or Lease Agreement and shall be attached to and made a part of your Housing Voucher Contract and/or Lease Agreement.  All other covenants, terms and conditions of the original Housing Voucher Contract and/or Lease Agreement remain the same.

**To the Tenant Only**
If you disagree with this decision, you may request an informal hearing.  If a hearing is desired, you must submit a written request to this office within 14 days of this notice or your right to a hearing will be waived.

**Signatures**

Housing Agency: Delaware County Housing Authority          Family: EARLANDO SAMUEL

_____                    _____
Signature                                  Signature

*no sigs.*

*17*



Exh 14

List Of Ingermand Property Management & Delaware County Housing Authority Defendants

DAWN WARE, HCV SENIOR SPECIALIST

DCHA and LAURA BLACKBURN, DIRECTOR

CHRISTINA PRO, HCV SPECIALIST

INGERMAN CONCORD POINTE, Apartments, GLEN MILLS

Rashida Smith General Manager Ingerman Birchwood At Rodney Court

Ingerman Birchwood Propery Management

Rashida Smith General Manager Birchwood At Concord Pointe

RyAnn Williams Assistant Manager Concord Pointe

Nefertiti Rivers, General Manager, Ingerman Rodney Square

Greg Ward Maintenance Specialist /Asst/ Mamager? Ingerman Concord Pointe

Bailey McCann Property Manager Concord Pointe

Nefertiti Rivers, General Manager, Ingerman Concord

Terri Hardin Assistant Manager  Concord Pointe

14

*Exh 15*

# LEASE AGREEMENT

This Lease Agreement ("Lease") as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented is a legally binding document that will become final in three (3) business days. You should read and understand the Lease in its entirety before signing it. If you do not understand any portion, you are encouraged and have the right to consult an attorney before signing the Lease.

1. **NAMES OF LANDLORD AND TENANT(S)**

   Name of Landlord: <u>Concord Pointe Senior Associates, LP</u>

   Address of Landlord:

   <u>452 Parker Place</u>

   <u>Glen Mills, PA 19342</u>

   Phone Number of Landlord: <u>(610) 558-3789</u>

   Address to Send Rent Payments:

   <u>452 Parker Place</u>

   <u>Glen Mills, PA 19342</u>

   Name(s) of Tenant(s) Signing Lease:

   <u>Earlando Samuel</u>

   Name(s) of Occupants:

   <u>Earlando Samuel</u>

2. **DEFINITIONS**

   a. The term "Unit" or "Apartment" refers to the apartment Landlord agrees to rent to Tenant and the Tenant agrees to rent from Landlord.

   b. The term "Building" refers to the building in which the Unit is located.

   c. The term "Property" refers to the grounds on which the Building sits.

3. **PROPERTY**

   a. The exact address of the Property is:

   <u>Concord Pointe Senior Associates, LP</u>

   <u>207 Parker Place Unit#207</u>

   <u>Concord, PA 19342</u>

 

**Revised & Effective 2/1/17**

Landlord does not discriminate based upon race, color, religion, sex, national origin, disability, familial status, sexual orientation, gender identity or marital status.

*Exh 15*

**DE**
　　XV.　　Landlord Tenant Code-Title 25

## MISCELLANEOUS DOCUMENTS
- Move-In/Move-Out Inspection Form
- Tenant Handbook
- Truth-in-Renting Guide (NJ only)
- Landlord Tenant Code (DE only)
- Good Housekeeping and Rental Suitability Handbooks (Philadelphia only)
- Lease Package Checklist

## DISCLOSURE STATEMENTS
- Environmental Remediation
- Lead Based Paint
- Wireless Emergency Alert System

## 46. ADDITIONAL CONDITIONS BETWEEN LANDLORD AND TENANT(S)

By signing this Lease, Tenant(s) agrees he/she has read and understands all of the terms and conditions set for herein. If not, Tenant(s) shall ask for additional time to review the Lease and may seek the advice of an attorney.

The Lease, together with any Addendums, Attachments, Miscellaneous Documents, Disclosure Statements and Resident Handbook is the legally binding Agreement between the Tenant(s) and Landlord and supersedes any and all previously signed Leases. Aside from Landlord's Agent, any Agreement between the Tenant(s) and others does not constitute written permission by Landlord. No other Agreement (oral or written) shall be binding or part of the Lease unless reduced to writing and signed by both the Tenant(s) and Landlord.

_____　　　　11-27-19
HEAD OF HOUSEHOLD　　　　　　　　　　　DATE

_____　　　　_____
TENANT　　　　　　　　　　　　　　　　　　DATE

_____　　　　_____
TENANT　　　　　　　　　　　　　　　　　　DATE

_____　　　　11/27/19
LANDLORD'S AGENT　　　　　　　　　　　　DATE



Exh 16

Date: May 24, 2003

LYNN COX- H.U.D INVESTIGATIONS
THE WANAMAKER BUILDING
100 PENN SQUARE EAST
PHILADELPHIA, PA. 19107
215-656-0574 EXT. 3326

## COMPLAINT

Dear Mam;


Attached you will find a letter addressed to V. Karpov and sent to Laura Blackburn, Director of DCHA in regards to Mr. Karpov's most recent act of retaliation against me for complaining about his activities and conduct in regards to doing business with H.U.D.

This latest act of May 20th, 2003, along with *his attempt to evict me*, telling L. Blackburn that I had a *unreported person* living with me, his *intentional failure to address any of my concerns and issues* in regards to the needed repairs, safety and health issues in this unit and *shutting down the heating system* for this unit after the video-taped March 3rd, 2003 inspection, are considered by me and any other reasonable person to be retaliatory and intimidating.

I've had to rely on the oven for heat since then and have not yet received a requested copy of that inspection report. These acts of retaliation have caused me much alarm and emotional distress to the point of having to get medical treatment for re-occurrences of panic attacks and are prohibited and in violation of Federal and State Statute and Regulations.  *See 24 CFR Part 1 1.7 (e) Intimidatory or retaliatory acts prohibited- P.A. Code 34§ 81.93. Intimidatory or retaliatory acts.*

I trust that your office will address these matters appropriately and if you have any questions or comments in regards to the above-mentioned matters, as always, please feel free to contact me.

Thank-you;

Earlando Samuel
1146-B Holland Street
Crum Lynne, Pa. 19022
610-833-2823
E-Mail-Easee1@att.net

Cc/file

Exh 17



| | |
|---|---|
| Issue Date | December 3, 2008 |
| Audit Report Number | 2009-PH-1002 |

TO:         Dennis G. Bellingtier, Director, Office of Public Housing, Pennsylvania State
            Office, 3APH

FROM:       John P. Buck, Regional Inspector General for Audit, Philadelphia Regional
            Office, 3AGA

SUBJECT:    The Delaware County Housing Authority, Woodlyn, Pennsylvania, Did Not
            Ensure That Its Section 8 Housing Choice Voucher Program Units Met
            Housing Quality Standards

# **HIGHLIGHTS**

**What We Audited and Why**

We audited the Delaware County Housing Authority's (Authority) administration
of its housing quality standards inspection program for its Section 8 Housing
Choice Voucher program as part of our fiscal year 2008 audit plan. This is our
second and final of two reports to be issued on the Authority's Section 8 Housing
Choice Voucher program. The audit objective addressed in this report was to
determine whether the Authority ensured its program units met housing quality
standards in accordance with U.S. Department of Housing and Urban
Development (HUD) requirements.

**What We Found**

The Authority did not adequately administer its inspection program to ensure that
its program units met housing quality standards as required. We inspected 61

housing units and found that 60 units did not meet HUD's housing quality standards. Moreover, 32 of the 60 units had health and safety violations that the Authority's inspectors did not observe or report during their last inspection. The Authority spent $43,324 in program and administrative funds for these 32 units.

The Authority did not properly abate rents when units failed its housing quality standards inspections. We reviewed 25 program units that did not pass the Authority's housing quality standards inspections and determined that the Authority failed to abate payments for 21 of the units and inappropriately abated payments for four units. The 21 units remained in a failing status for as long as 65 days. However, the Authority failed to abate the program rents or terminate the contracts for these units, resulting in improper payments of $6,522. In four cases, the Authority did not resume the housing assistance payments once the units became compliant with housing quality standards, resulting in $1,520 in underpayments to landlords.

We estimate that over the next year if the Authority does not implement adequate procedures and controls to ensure that its program units meet housing quality standards and that abatement requirements are enforced, HUD will pay more than $1.9 million in housing assistance on units with material housing quality standards violations and for units that should have had assistance payments abated.

## What We Recommend

We recommend that the Director of HUD's Pennsylvania State Office of Public Housing require the Authority to ensure that housing units inspected during the audit are repaired to meet HUD's housing quality standards, reimburse its program from nonfederal funds for the improper use of $43,324 in program and administrative funds for units that materially failed to meet HUD's housing quality standards, and implement adequate procedures and controls to ensure that in the future, program units meet housing quality standards to prevent an estimated $1.9 million from being spent annually on units that materially fail to meet HUD's housing quality standards. Further, we recommend that HUD require the Authority to reimburse its program $6,522 for the 21 units for which it did not abate assistance payments, pay landlords $1,520 for payments that were not abated correctly, and enforce its established policies and procedures to ensure that its abatements comply with HUD requirements, thereby preventing an estimated $26,000 from being spent annually on units that should have had assistance payments abated.

For each recommendation without a management decision, please respond and provide status reports in accordance with HUD Handbook 2000.06, REV-3. Please furnish us copies of any correspondence or directives issued because of the audit.

Exh 11

**Auditee's Response**

We provided our discussion draft audit report to the Authority's executive
director and HUD officials on October 22, 2008.  We discussed the audit results
with the Authority and HUD officials throughout the audit and at an exit
conference on October 30, 2008.  The Authority provided written comments to
our draft report on November 7, 2008.  The complete text of the Authority's
response, along with our evaluation of that response, can be found in appendix B
of this report.

# TABLE OF CONTENTS

Background and Objectives                                                        5

Results of Audit
    Finding 1:  Controls over Housing Quality Standards Were Inadequate           6
    Finding 2:  The Authority Did Not Abate Housing Assistance Payments as       14
    Required

Scope and Methodology                                                           17

Internal Controls                                                               19

Appendixes
    A.   Schedule of Questioned Costs and Funds to Be Put to Better Use          21
    B.   Auditee Comments and OIG's Evaluation                                   22

Exh 17

# BACKGROUND AND OBJECTIVES

The Delaware County Housing Authority (Authority) was created by the Delaware County Council in January 1938. The Authority was created to address the lack of decent, safe, and sanitary housing for the low-income families in the Delaware County, Pennsylvania, area. The Authority is governed by a board of commissioners made up of a chairman, vice chairman, secretary, assistant secretary, treasurer, and assistant treasurer. The current executive director is Lawrence E. Hartley. The Authority's main administrative office is located at 1855 Constitution Avenue, Woodlyn, Pennsylvania.

Under the Section 8 Housing Choice Voucher program, the Authority makes rental assistance payments to landlords on behalf of eligible low-income families. HUD compensates the Authority for the cost of administering the program through administrative fees.

HUD authorized the Authority to provide leased housing assistance payments for 2,753 eligible households. It authorized the Authority the following financial assistance for fiscal years 2005 through 2007:

| Authority fiscal year | Annual budget authority | Disbursed |
|---|---|---|
| 2005 | $21,541,266 | $21,541,266 |
| 2006 | $20,026,512 | $20,026,512 |
| 2007 | $20,560,195 | $20,560,195 |
| Totals | $62,127,973 | $62,127,973 |

HUD regulations at 24 CFR [*Code of Federal Regulations*] 982.305(a) state that the public housing authority may not give approval for the family of the assisted tenancy or execute a housing assistance contract until the authority has determined that the unit has been inspected by the authority and meets HUD's housing quality standards.

HUD regulations at 24 CFR 982.405(a) require public housing authorities to perform unit inspections before the initial move-in and at least annually. The authority must inspect the unit leased to the family before the term of the lease, at least annually during assisted occupancy, and at other times as needed to determine whether the unit meets housing quality standards.

The audit objective addressed in this report was to determine whether the Authority ensured its program units met housing quality standards in accordance with U.S. Department of Housing and Urban Development (HUD) requirements. As part of this audit, we also reviewed the Authority's portability program. Minor findings noted in relation to the program were separately communicated to the Authority in a letter dated November 17, 2008.



# RESULTS OF AUDIT

## Finding 1:  Controls over Housing Quality Standards Were Inadequate

The Authority did not adequately enforce HUD's housing quality standards.  Of 61 program units selected for inspection, 60 did not meet HUD's housing quality standards, and 32 materially failed to meet housing quality standards.  The Authority's inspectors did not observe or report 308 health and safety violations which existed at the units when they conducted their inspections.  The deficiencies occurred because the Authority did not ensure that its housing inspectors had sufficient knowledge of housing quality standards and did not implement an effective quality control inspection process.  As a result, the Authority spent $43,324 in program and administrative funds on units that materially failed to meet HUD's housing quality standards and, consequently, were not decent, safe, and sanitary.  If the Authority does not implement adequate procedures and controls to ensure that its program units meet HUD's housing quality standards, we estimate that over the next year, it will pay more than $1.9 million in housing assistance for units that materially fail to meet housing quality standards.

**Section 8 Tenant-Based Housing Units Were Not in Compliance with HUD's Housing Quality Standards**

We statistically selected 61 units from unit inspections passed by the Authority's inspectors during the period November 1, 2007, to January 31, 2008.  The 61 units were selected to determine whether the Authority ensured that the units in its program met housing quality standards.  We inspected the selected units between February 26 and March 7, 2008.

Of the 61 units inspected 60 (98 percent) had 640 housing quality standards violations.  Additionally, 32 of the 60 units (52 percent) were considered to be in material noncompliance since they had health and safety violations that predated the Authority's last inspection and were not identified by the Authority's inspectors and/or repaired.  The 32 units had 308 health and safety violations that existed before the Authority's last inspection report and were not identified by the Authority's inspectors.  HUD regulations at 24 CFR 982.401 require that all program housing meet HUD's housing quality standards at the beginning of the assisted occupancy and throughout the tenancy.

The following table categorizes the 640 housing quality standards violations in the 60 units that failed the housing quality standards inspections.

| Category of violations | Number of violations | Number of units |
|---|---|---|
| Electrical | 187 | 43 |
| Security | 59 | 28 |
| Other potentially hazardous features | 40 | 20 |
| Site and neighborhood conditions | 39 | 20 |
| Wall condition | 37 | 18 |
| Stairs, porch, landing, and deck | 35 | 25 |
| Tub/shower | 26 | 21 |
| Floor conditions | 25 | 13 |
| Other interior hazards | 24 | 14 |
| Stove, oven, and refrigerator | 21 | 16 |
| Heating, ventilation, and plumbing | 20 | 13 |
| Interior stairs | 19 | 17 |
| Lead-based paint | 18 | 6 |
| Windows | 14 | 5 |
| Exterior surfaces | 14 | 12 |
| Roof and gutters | 13 | 10 |
| Ceiling conditions | 11 | 7 |
| Smoke detectors | 11 | 8 |
| Toilet | 10 | 9 |
| Space for preparation, storage, and serving of food | 8 | 7 |
| Sink and cabinets | 3 | 3 |
| Evidence of infestation | 2 | 2 |
| Access to units | 1 | 1 |
| Foundation | 1 | 1 |
| Fire exits | 1 | 1 |
| Chimney | 1 | 1 |
| **Total** | **640** | |

We presented the results of the housing quality standards inspections to the Authority and to the Director of HUD's Pennsylvania State Office of Public Housing.

**Housing Quality Standards
Violations Were Identified**

The following pictures illustrate some of the violations we noted while conducting housing quality standards inspections at the Authority's leased housing units.



Inspection V54274:  There are exposed wires in the recessed light fixture.  This violation was not identified during the Authority's December 12, 2007, inspection.



Inspection V53442:  The switch is not installed in the proper switch box, exposing electrical wiring. This violation was not identified during the Authority's January 7, 2008, inspection.



Inspection V54218:  The recessed light fixture at the base of stairs is not secure and wires are exposed.  This violation was not identified during the Authority's November 21, 2007, inspection.



Inspection V45074:  The furnace flue is disconnected from the wall, allowing harmful gases back into the basement.  This violation was not identified during the Authority's November 28, 2007, inspection.





Inspection V73332:  Improper and poor ventilation of the heating and air conditioning unit allows harmful gases to seep back into the basement.  This violation was not identified during the Authority's January 28, 2008, inspection.



Inspection V07006:  The handrail is not running the full length of the basement stairs.  This violation was not identified during the Authority's December 12, 2007, inspection.





Inspection V73712:   The handrail is not running the full length of the basement stairs.   This violation was not identified during the Authority's December 10, 2007, inspection.

**The Authority Did Not Have Adequate Procedures and Controls over Its Inspectors**

Although HUD regulations at 24 CFR 982.401 and the Authority's administrative plan required the Authority to ensure that its program units met housing quality standards, it failed to do so because it did not ensure that its housing inspectors had sufficient knowledge of housing quality standards and did not implement an effective quality control inspection process.

**The Authority's Housing Inspectors Did Not Have Sufficient Knowledge of Housing Quality Standards**

The Authority's housing inspectors did not have sufficient knowledge of housing quality standards.   The Authority did not ensure its three housing inspectors were equipped with the knowledge they needed to perform inspections in compliance with HUD's housing quality standards requirements.   As a result, the inspectors misinterpreted the requirements and missed or overlooked a number of violations.

The Authority's inspectors stated that a number of the missed violations we found were simply overlooked but that some violations were missed due to insufficient training.   For example, the inspectors stated that electrical outlets were not checked with a circuit tester to ensure that they were wired correctly.   They stated that they were only trained to ensure that electricity was running to the outlet and not that it was wired correctly.   The inspectors also stated that they were required to perform from 8 to 14 inspections per day and that the quality of inspections sometimes suffered because of their workload.   The Authority needs to ensure

11

G417

that all of its inspectors are equipped with the knowledge and resources they need to perform inspections in a consistent manner and in compliance with HUD requirements.

### The Authority Did Not Implement an Effective Quality Control Inspection Process as a Tool to Ensure That Inspections Were Performed in Compliance with HUD's Housing Quality Standards

The Authority did not implement an effective quality control process as a tool to ensure that inspections were performed in compliance with HUD's housing quality standards. HUD regulations at 24 CFR 982.54(d) require the public housing authority's administrative plan to sufficiently cover policies, procedural guidelines, and performance standards for conducting housing quality inspections. The Authority's administrative plan sufficiently covered policies, procedural guidelines, and performance standards for conducting housing quality inspections. However, the Authority did not adequately use its quality control inspections to determine whether individual performance or specific housing quality standards training issues needed to be addressed.

The Authority's administrative plan states that the purpose of quality control inspections is to determine that each inspector conducts accurate and complete inspections and to ensure that there is consistency among inspectors in the application of the housing quality standards. Also, HUD's Housing Choice Voucher Guidebook 7420.10G states that the results of the quality control inspections should be provided as feedback on inspectors' work, which can be used to determine whether individual performance or general housing quality standards training issues need to be addressed.

The Authority performed 103 quality control inspections from October 1, 2005, through September 31, 2007. The Authority's quality control results differed significantly from its original inspection results. Of the 103 initially passed inspections, 53 passed and 50 failed. The results of the quality control inspections demonstrated problems with the Authority's original housing quality standards inspections. The Authority stated that the results of the quality inspections were verbally communicated to the housing inspectors. However, we did not find sufficient evidence to show that the Authority used the results of the followup quality control inspections to identify training issues that needed to be addressed.

### Conclusion

The Authority's tenants were subjected to health and safety-related violations, and the Authority did not properly use its program funds when it failed to ensure that its program units complied with HUD's housing quality standards. In accordance with HUD regulations at 24 CFR 982.152(d), HUD is permitted to reduce or

12

offset any program administrative fees paid to a public housing authority if it fails to perform its administrative responsibilities correctly or adequately, such as not enforcing HUD's housing quality standards. The Authority disbursed $39,839 in housing assistance payments to landlords and received $3,485 in program administrative fees for the 32 units that materially failed to meet HUD's housing quality standards. If the Authority implements an effective quality control program and ensures that inspectors are equipped with the knowledge they need to perform inspections in a consistent manner and in compliance with HUD requirements, we estimate that more than $1.9 million in future housing assistance payments will be spent for units that are decent, safe, and sanitary. Our methodology for this estimate is explained in the Scope and Methodology section of this report.

## Recommendations

We recommend that the Director of HUD's Pennsylvania State Office of Public Housing require the Authority to

1A.   Certify that the owners of the 60 program units cited in this finding have repaired the units containing housing quality standards violations.

1B.   Reimburse HUD's program $43,324 from nonfederal funds ($39,839 for housing assistance payments and $3,485 in associated administrative fees) for the 32 units that materially failed to meet HUD's housing quality standards.

1C.   Ensure that its housing inspectors are equipped with the knowledge they need to perform inspections in compliance with HUD's housing quality standards and implement an effective quality control process to prevent $1,908,312 in program funds from being spent on units that do not comply with the standards.

13

## Finding 2:  The Authority Did Not Abate Housing Assistance Payments as Required

The Authority did not appropriately abate housing assistance payments after its inspectors determined that program units did not meet housing quality standards.  We reviewed the files for 25 program units that failed the Authority's housing quality standards inspections and determined that payments for 21 units were not abated and payments for four units were not abated correctly.  This condition occurred because Authority personnel failed to follow the Authority's own policies regarding abatements.  As a result, the Authority paid $6,522 in ineligible housing assistance for units that were not decent, safe, and sanitary.  The Authority also underpaid landlords $1,520 in housing assistance for four units with improperly abated payments.  We estimate that over the next year, HUD will pay more than $26,000 in housing assistance for units for which the Authority should have abated the payments.

---

**The Authority Did Not Appropriately Abate Payments for Failed Units**

The Authority did not abate housing assistance payments as required.  HUD regulations at 24 CFR 982.404(a) require public housing authorities to take prompt and vigorous action to enforce the owners' obligations and state that the authorities must not make any housing assistance payments for a dwelling unit that fails to meet the housing quality standards unless the owner corrects the defect within the period specified by the authority and the authority has verified the correction.  The timeframe for correction of life-threatening violations will be no more than 24 hours, and other violations will be corrected within no more than 30 calendar days.  The Authority made ineligible housing assistance payments totaling $6,522 because it paid owners for units that continued to have housing quality standards violations although the period for the owners to make the necessary repairs had expired.  Using inspection data for the period November 1, 2007, through January 31, 2008, we determined that there were 54 housing units in which the owners did not repair the housing quality standards violations within the required 30-day timeframe.  We selected 25 of the 54 units to determine whether the Authority properly abated the housing assistance payments.  The Authority failed to abate payments for 21 units (84 percent) as required.  The 21 units were in a failed status between 40 and 65 days.

Of the 25 housing units reviewed, the Authority abated the housing assistance payments for four units (16 percent).  However, these payments were not abated correctly.  The Authority's administrative plan states that housing assistance payments will resume effective the day the unit passes inspection.  However, the Authority did not resume the payments until the beginning of the month after the

14

units came into compliance with housing quality standards and not the day the unit passed inspection. As a result, the Authority underpaid the landlords $1,520 in housing assistance.

**The Authority Overlooked Established Policies and Procedures**

The Authority did not follow HUD requirements and its own policies and procedures when it failed to abate payments for 21 units and incorrectly abated payments for four units. The Authority's administrative plan clearly defines its policies for abating payments for units that fail to meet housing quality standards. Specifically, the plan states that if an owner fails to correct housing quality standards deficiencies by the specified date, the Authority will abate housing assistance payments no later than the first of the month following the specified correction period. Also, the plan states that the housing assistance for units with abated payments will resume effective the day the unit passes inspection. The Authority needs to enforce its policies and procedures to ensure that it appropriately abates housing assistance payments when necessary.

**Conclusion**

Contrary to HUD regulations and its own administrative plan, the Authority made assistance payments for units that had housing quality standards violations although the period for the owners to make the necessary repairs had expired. As a result, the Authority made ineligible housing assistance payments totaling $6,522. Also, the Authority did not abate housing assistance in accordance with its own administrative plan. As a result, it underpaid its landlords $1,520 in housing assistance.

If the Authority implements the recommendations in this report to ensure compliance with HUD regulations and its own administrative plan for enforcing housing quality standards, we estimate that over a one-year period, $26,088 in housing assistance payments will be properly abated for units that are not in compliance with housing quality standards, and those funds can be spent on housing units that are decent, safe, and sanitary. Our methodology for this estimate is explained in the Scope and Methodology section of this report.

**Recommendations**

We recommend that the Director of HUD's Pennsylvania State Office of Public Housing require the Authority to

Exh 17

2A.    Repay its program, $6,522 from nonfederal funds for the housing assistance payments identified by the audit that were not abated as required.

2B.    Pay $1,520 from program funds to landlords whose housing assistance payments were not abated correctly.

2C.    Enforce its established policies and procedures to ensure that its abatements comply with HUD requirements thereby putting $26,088 in program funds to better use over a one-year period.

Exh 17

## SCOPE AND METHODOLOGY

To accomplish our objective, we reviewed

- Applicable laws, regulations, the Authority's administrative plan, HUD's program requirements at 24 CFR Parts 982 and 985, and HUD's Housing Choice Voucher Guidebook 7420.10G.

- The Authority's accounting records, annual audited financial statements for 2005 and 2006, tenant files, computerized databases, policies and procedures, board meeting minutes, organizational chart, and program annual contributions contract.

- HUD's monitoring reports for the Authority.

We also interviewed the Authority's employees, HUD staff, and program households.

To achieve our audit objective, we relied in part on computer-processed data in the Authority's database. Although we did not perform a detailed assessment of the reliability of the data, we did perform a minimal level of testing and found the data to be adequate for our purposes.

We statistically selected 61 of the Authority's program units to inspect from 612 unit inspections passed by the Authority's inspectors during the period November 1, 2007, to January 31, 2008. We selected the sample using the U.S. Army Audit Agency Statistical Sampling System software. The 61 units were selected to determine whether the Authority's program units met housing quality standards. The sampling criteria used a 90 percent confidence level, 50 percent estimated error rate, and precision of plus or minus 10 percent.

Our sampling results determined that 32 of 61 units (52 percent) materially failed to meet HUD's housing quality standards. Materially failed units were those with at least one health and safety violation or exigent (24-hour) health and safety violation that predated the Authority's previous inspections. All units were ranked, and we used auditors' judgment to determine the material cutoff line.

Projecting our sample review results of the 32 units (52 percent) that materially failed housing quality standards inspections indicates that 322 (or 52.46 percent of the total population) of 612 units would materially fail to meet housing quality standards. The sampling error is plus or minus 9.98 percent. There is a 90 percent confidence that the frequency of occurrence of program units materially failing housing quality standards inspections lays between 42.48 and 62.44 percent of the population. This equates to an occurrence of between 259 and 382 units of the 612 units in the population. We used the most conservative number, which is the lower limit or 259 units.

We analyzed the applicable Authority databases and estimated that the average annual housing assistance payment per recipient in our sample universe was $7,368. Using the lower limit of the

Exh 17

estimate of the number of units and the estimated average annual housing assistance payment, we estimate that the Authority will spend $1,908,312 (259 units times $7,368 estimated average annual housing assistance) annually for units that are in material noncompliance with HUD's housing quality standards.

Using the inspection data provided by the Authority for all inspections performed between November 1, 2007, and January 31, 2008, we determined that the Authority performed housing quality standards inspections on a total of 786 units. Using data mining software, we determined that 343 of the units failed the Authority's housing quality standards inspection at least once. The Authority should have abated housing assistance payments to owners of 54 of the 343 units because the owners did not make repairs within 30 calendar days as required. We selected the top 25 units with the greatest number of days between failed and passed inspection to review. Of the 25 units reviewed, the Authority failed to abate payments on 21 units (84 percent) as required and improperly abated payments on four units (16 percent). The units were in a failed status between 40 and 65 days after the original failed inspection. We calculated $6,522 in ineligible payments by identifying the monthly housing assistance payments for each tenant that should have been abated by reviewing the Authority's housing assistance payment register. We determined the daily payment amounts by dividing the monthly payment by 30 (days in a month) and calculated the ineligible payment for each tenant by multiplying the number of days the payments should have been abated by the daily payment amounts. Since we reviewed units from a universe of inspections that occurred during a three-month period of activity, we multiplied $6,522 by four to conservatively estimate that the Authority could put $26,088 to better use over a period of a year by abating assistance payments as required.

Our estimates are presented solely to demonstrate the annual amount of program funds that could be put to better use on decent, safe, and sanitary housing if the Authority implements our recommendations. While these benefits would recur indefinitely, we were conservative in our approach and only included the initial year in our estimate.

We performed our on-site audit work from February through September 2008 at the Authority's Section 8 office located at 1855 Constitution Avenue, Woodlyn, Pennsylvania. The audit covered the period October 2005 through January 2008 but was expanded when necessary to include other periods.

We performed our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

18

Exh 17

# INTERNAL CONTROLS

Internal control is an integral component of an organization's management that provides reasonable assurance that the following objectives are being achieved:

- Effectiveness and efficiency of operations,
- Reliability of financial reporting, and
- Compliance with applicable laws and regulations.

Internal controls relate to management's plans, methods, and procedures used to meet its mission, goals, and objectives. Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations. They include the systems for measuring, reporting, and monitoring program performance.

## Relevant Internal Controls

We determined the following internal controls were relevant to our objective:

- Program operations – Policies and procedures that management has implemented to reasonably ensure that a program meets its objectives.

- Validity and reliability of data – Policies and procedures that management has implemented to reasonably ensure that valid and reliable data are obtained, maintained, and fairly disclosed in reports.

- Compliance with laws and regulations – Policies and procedures that management has implemented to reasonably ensure that resource use is consistent with laws and regulations.

We assessed the relevant controls identified above.

A significant weakness exists if management controls do not provide reasonable assurance that the process for planning, organizing, directing, and controlling program operations will meet the organization's objectives.

## Significant Weaknesses

Based on our review, we believe the following item is a significant weakness:

Exh 17

- The Authority lacked sufficient procedures and controls to ensure that unit inspections complied with HUD regulations, that program units met minimum housing quality standards, and that assistance payments were abated for units that did not meet housing quality standards.

20

# APPENDIXES

## Appendix A

### SCHEDULE OF QUESTIONED COSTS
### AND FUNDS TO BE PUT TO BETTER USE

| Recommendation number | Ineligible 1/ | Funds to be put to better use 2/ |
|---|---|---|
| 1B | $43,324 | |
| 1C | | $1,908,312 |
| 2A | $6,522 | |
| 2B | | $1,520 |
| 2C | | $26,088 |
| **Total** | **$49,846** | **$1,935,920** |

1/   Ineligible costs are costs charged to a HUD-financed or HUD-insured program or activity that the auditor believes are not allowable by law; contract; or federal, state, or local policies or regulations.

2/   Recommendations that funds be put to better use are estimates of amounts that could be used more efficiently if an Office of Inspector General (OIG) recommendation is implemented.  This includes reductions in outlays, deobligation of funds, withdrawal of interest subsidy costs not incurred by implementing recommended improvements, avoidance of unnecessary expenditures noted in preaward reviews, and any other savings which are specifically identified.  In this instance, if the Authority implements our recommendations, it will use $1,520 in Section 8 funds to serve its purpose of assisting eligible families, and will cease to incur program costs for units that are not decent, safe, and sanitary and, instead, will expend those funds for units that meet HUD's standards, thereby putting approximately $1.9 million in program funds to better use.  Once the Authority successfully implements our recommendation, this will be a recurring benefit.  Our estimate reflects only the initial year of this benefit.

*Exh*
*68*



| Issue Date |
| --- |
| August 15, 2008 |

| Audit Report Number |
| --- |
| 2008-PH-1012 |

TO:   Dennis G. Bellingtier, Director, Office of Public Housing, Pennsylvania State Office, 3APH

FROM:   *Gregory for* John P. Buck, Regional Inspector General for Audit, Philadelphia Regional Office, 3AGA

SUBJECT:   The Delaware County Housing Authority, Woodlyn, Pennsylvania, Did Not Adequately Administer Its Housing Assistance Payments

## __HIGHLIGHTS__

**What We Audited and Why**

We audited the Delaware County Housing Authority's (Authority) Section 8 Housing Choice Voucher program (program). We selected the Authority for an audit based on our analysis of various risk factors relating to the housing authorities under the jurisdiction of the U.S. Department of Housing and Urban Development's (HUD) Philadelphia regional office. This is the first of two audit reports that we plan to issue on the Authority's program. Our audit objective was to determine whether the Authority administered its housing assistance payments in compliance with HUD requirements and its own administrative plan.

**What We Found**

The Authority did not adequately administer its housing assistance payments in compliance with HUD requirements and its own administrative plan. It incorrectly calculated housing assistance and utility allowance payments and failed to execute housing assistance contracts in a timely manner, resulting in about $58,900 in ineligible payments and more than $3,300 in tenant underpayments. It also could not support more than $26,500 in housing

Exh 18

assistance and utility allowance payments.  If the Authority does not implement sufficient controls or procedures to ensure that its program is administered in compliance with HUD requirements, we estimate that over the next year it will pay more than $926,300 in ineligible housing assistance.

**What We Recommend**

We recommend that HUD require the Authority to reimburse the program from nonfederal funds for ineligible payments of about $58,900, reimburse the appropriate tenants or households more than $3,300 for the underpayment of housing assistance and utility allowances, provide documentation or reimburse the program more than $26,500 from nonfederal funds for unsupported payments, and implement sufficient controls or procedures to prevent ineligible payments of more than $926,300 in program funds over the next year.

For each recommendation without a management decision, please respond and provide status reports in accordance with HUD Handbook 2000.06, REV-3. Please furnish us copies of any correspondence or directives issued because of the audit.

**Auditee's Response**

We provided our discussion draft audit report to the Authority on July 7, 2008. We discussed the report with the Authority during the audit and at an exit conference on July 10, 2008.   Following the exit conference, we provided an updated draft to the Authority on July 21, 2008.  The Authority provided written comments to our draft report on August 4, 2008.   The complete text of the Authority's response, along with our evaluation of that response, can be found in appendix B of this report.

Exh 18

# TABLE OF CONTENTS

Background and Objectives                                                          4

Results of Audit
    Finding:  The Authority Did Not Adequately Administer Its Housing Assistance    5
    Payments

Scope and Methodology                                                            10

Internal Controls                                                               12

Appendixes
    A.  Schedule of Questioned Costs and Funds to Be Put to Better Use              14
    B.  Auditee Comments and OIG's Evaluation                                   15

# BACKGROUND AND OBJECTIVES

The Delaware County Housing Authority (Authority) was created by the Delaware County Council in January 1938. The Authority was created to address the lack of decent, safe, and sanitary housing for the low-income families in the Delaware County, Pennsylvania, area.

The Authority is governed by a board of commissioners made up of a chairman, vice chairman, secretary, assistant secretary, treasurer, and assistant treasurer. All members of the board, except the secretary, are appointed by the Delaware County Council. The appointed members of the board appoint a secretary who also acts as the Authority's executive director. The present executive director is Lawrence E. Hartley. The Authority employs a staff of approximately 75 individuals at its offices located at 1855 Constitution Avenue, Woodlyn, Pennsylvania.

The Authority is authorized to have 2,753 contracted units under its consolidated annual contributions contract with the U.S. Department of Housing and Urban Development (HUD). The contract defines the terms and conditions under which the Authority agrees to develop and operate all projects under the agreement. HUD authorized the Authority the following financial assistance for fiscal years 2005 through 2007:

| Authority fiscal year | Annual budget authority | Disbursed |
|---|---|---|
| 2005 | $21,541,266 | $21,541,266 |
| 2006 | $20,026,512 | $20,026,512 |
| 2007 | $20,560,195 | $20,560,195 |
| Totals | $62,127,973 | $62,127,973 |

Our audit objective was to determine whether the Authority administered its housing assistance payments in compliance with HUD requirements and its own administrative plan. As part of this audit, we also reviewed the Authority's Family Self-Sufficiency program. Minor findings noted in relation to that program were separately communicated to the Authority in a letter, dated June 9, 2008.

Ex 18

# RESULTS OF AUDIT

## Finding:  The Authority Did Not Adequately Administer Its Housing Assistance Payments

The Authority did not administer its housing assistance payments in compliance with HUD requirements and its own administrative plan.  It often incorrectly calculated housing assistance and utility allowance payments and did not execute some of its housing assistance contracts within the required timeframe.  It also did not have appropriate documentation to support housing assistance and utility allowance payments in more than 18 percent of the sample cases reviewed.  These problems occurred because the Authority did not implement sufficient controls to ensure that it followed applicable requirements and did not assign sufficient staff to properly administer its tenant files and related assistance payments.  As a result, the Authority made about $58,900 in ineligible payments, underpaid tenants more than $3,300, and was unable to support more than $26,500 in payments.  The Authority will also make approximately $926,300 in ineligible payments from program funds over the next year if it does not implement sufficient controls or procedures to ensure that it administers its assistance payments in compliance with applicable requirements.

**The Authority Incorrectly
Calculated Housing Assistance
and Utility Allowance Payments**

We reviewed tenant files for 65 program participants.  In 37 cases, the Authority incorrectly calculated housing assistance and/or utility allowance payments.  As a result, it made ineligible overpayments of $30,759 and underpaid tenants more than $3,300.  The payments were incorrectly calculated because of the following deficiencies noted in the files:

- ➢ 30 files had errors in the calculation of income for one or more certifications,
- ➢ Nine files had incorrect calculations for deductions from annual income,
- ➢ Six files had incorrect utility allowance calculations for one or more certifications,
- ➢ Five files had incorrect payment standards for one or more certifications,
- ➢ Two files had zero income reported by a member of the family that was not periodically certified by the Authority as required by its administrative plan, and
- ➢ Two files had unreported income by the household that the Authority became aware of in subsequent certifications through its use of HUD's Enterprise Income Verification (EIV) system; however, the Authority did

not determine the resulting overpayments to the households and accordingly set up repayment plans for the tenants as required by its administrative plan.

HUD's Housing Choice Voucher Guidebook 7420.10G, chapter 6, describes the guidelines for calculating rent and subsidies. Chapter 22 of the guidebook describes the quality control procedures necessary for ensuring that the calculations are correct. Specifically, chapter 22 states that establishing good quality control procedures will help housing authorities to ensure that staff's daily decision making on tenant eligibility and tenant rent complies with program regulations and is based on accurate information. With respect to families that report zero income, the Authority's administrative plan requires interim certifications every 90 days for families that report zero income. The Authority's administrative plan also requires tenants to report any changes in their income within 10 days of the change. The plan further states that tenants are responsible for repaying any excess payments that result from their actions or inactions.

The Authority established and implemented a quality control review process as described in chapter 22 of HUD's Housing Choice Voucher Guidebook. The Authority's quality control reviews showed problems with the accuracy of its housing assistance and utility allowance payment calculations. However, it did not take action or implement procedures to stop the deficiencies noted during the reviews from recurring.

The Authority can reduce the risk of error associated with calculations of rent and subsidies by implementing quality control procedures to ensure that the results of its quality control reviews are used as a tool to reduce and/or prevent recurring deficiencies.

**The Authority Made Ineligible Payments Because It Did Not Execute Assistance Contracts as Required**

The Authority did not execute housing assistance contracts within 60 days of the beginning of the lease term as required in 6 of 65 cases reviewed. As a result, it made $28,229 in ineligible housing assistance payments. In four of the six cases, the contracts were executed by the Authority after the allowed 60-day period. In the remaining two cases, the housing assistance contracts were never executed by the Authority. In both cases, the tenants have moved and are no longer active in the Authority's program.

The Authority's administrative plan and HUD requirements at 24 CFR [*Code of Federal Regulations*] 982.305 state that the Authority must make a best effort to ensure that the housing assistance contract is executed before the beginning of the

*Exh 18*

lease term and that the housing assistance contract must be executed no later than 60 calendar days from the beginning of the lease term. Any housing assistance contract executed after the 60-day period is void, and the Authority may not make housing assistance payment to the owner.

The Authority did not follow its own administrative plan and HUD requirements when it failed to execute the six housing assistance contracts within the required timeframe. Therefore, the $28,229 paid to the applicable tenants while there were no executed contracts is ineligible.

## The Authority Lacked Documentation to Support $26,596 in Payments

The Authority lacked documentation to support housing assistance and utility allowance payments in the amount of $26,596 for 12 or approximately 18 percent of the cases reviewed. Of the 67 files statistically selected for review, 10 were missing supporting documentation for income, one reflected an increase in the housing assistance payment that was not supported, and the Authority could not provide two of the files before the completion of our audit fieldwork due to errors in its archiving system.

According to 24 CFR 982.158, the Authority must maintain complete and accurate accounts and other records for the program in accordance with HUD requirements in a manner that permits a speedy and effective audit. During the term of each assisted lease and for at least three years thereafter, the Authority must keep a copy of the executed lease, housing assistance payments contract, and application from the family. Also, the Authority must keep records that provide income data for three years.

Since the Authority lacked appropriate documentation for 12 sample cases, the $26,596 in housing assistance and utility allowance payments made to the related tenants is unsupported.

## The Authority Needs to Strengthen Its Controls

The miscalculations of housing assistance and utility allowance payments generally occurred as a result of administrative errors by the Authority's staff. The staff often did not use due care in calculating housing assistance and utility allowance payments. Authority staff also stated that housing assistance contracts were in some cases executed beyond the required 60-day timeframe because the staff lost track of the related tenant files.

Exh 18

The Authority also did not implement sufficient controls to ensure that its program was administered in compliance with HUD requirements and its administrative plan. The Authority performed quality control reviews as required by HUD; however, its management did not take action to stop the deficiencies noted during the reviews from recurring. The Authority needs to strengthen its control process by implementing procedures to ensure that the results of its quality control reviews are used as a tool to reduce and/or prevent recurring deficiencies.

**The Authority Needs to
Evaluate Its Staff Levels**

During the period we reviewed, the Authority lost three or 30 percent of its 10 housing choice voucher occupancy aides. This situation may have created some difficulty for the Authority in terms of its case load management. Of the seven aides that remained, all had received Section 8 training; however, as of the end of our audit fieldwork on May 16, 2008, two had not passed the proficiency examinations.

The Authority had hired three additional aides to assist with its caseload; however, these individuals had not received formal Section 8 training as of the end of our audit fieldwork. Two of the aides were hired during our audit review period but were not assigned case loads before the end of our review period. The Authority should evaluate its staff levels and staff competencies with respect to its program and if necessary, make the appropriate adjustments to ensure that it has sufficient staff with the competencies required to administer the program in compliance with HUD requirements and its administrative plan.

**Conclusion**

The Authority failed to administer its program in compliance with HUD requirements and its own administrative plan. As a result, it paid about $58,900 in ineligible housing assistance, underpaid more than $3,300 in housing assistance, and made more than $26,500 in unsupported housing assistance payments. The deficiencies in the Authority's administration of its program occurred because it did not implement sufficient controls to ensure that it followed applicable requirements and did not assign sufficient staff with the competencies needed to administer the program.

If the Authority does not implement adequate controls or procedures to ensure that it complies with HUD requirements and its administrative plan, we estimate that it will make more than $926,300 in ineligible payments over the next year.

Exh 18

Our methodology for this estimate is explained in the Scope and Methodology section.

**Recommendations**

We recommend that the Director, Office of Public Housing, Pennsylvania State Office, require the Authority to

1A.    Reimburse its Section 8 program from nonfederal funds $58,988 for the ineligible housing assistance and utility allowance payments.

1B.    Reimburse the appropriate households $3,376 for the underpayment of housing assistance and utility allowances.

1C.    Provide support or reimburse its Section 8 program $26,596 from nonfederal funds for unsupported housing assistance and utility allowance payments.

1D.    Improve its controls by implementing procedures to help reduce and/or prevent recurring deficiencies in its payments calculation process, and ensure that housing assistance contracts are executed as required, thereby helping to put to better use $926,312 in ineligible payments over the next year.

1E.    Evaluate and adjust its staffing levels if necessary to ensure that it has adequate staff with the competencies needed to administer its program in compliance with applicable requirements.

1F.    Provide program training for all of its housing choice voucher occupancy aides who have not received training.

*Exh 18*

# SCOPE AND METHODOLOGY

We performed our on-site audit work between October 2007 and May 2008 at the Authority's office located at 1855 Constitution Avenue, Woodlyn, Pennsylvania. The audit covered the period October 1, 2005, through September 30, 2007, and was expanded when necessary to include other periods.

To determine whether the Authority administered its program in compliance with applicable HUD requirements, we reviewed

- Applicable laws and regulations; the Authority's administrative plan; HUD's program requirements at 24 CFR Parts 5, 982, and 984; HUD's Public and Indian Housing Notice 2004-01; and HUD's Housing Choice Voucher Guidebook 7420.10G;

- The Authority's accounting records, annual audited financial statements for 2005 and 2006, tenant files, computerized databases including housing assistance payment and family data, board meeting minutes, organizational chart, and annual contributions contract; and

- HUD's monitoring reports for the Authority.

We also interviewed the Authority's employees and HUD staff.

We performed our audit in accordance with generally accepted government auditing standards.

During the audit, we relied in part on computer-processed data in the Authority's database. Although we did not perform a detailed assessment of the reliability of the data, we did perform a minimal level of testing and found the data to be adequate for our purposes.

We statistically selected 67 of the tenants who received housing assistance payments during our audit period using a variable statistical sampling method developed by our computer audit specialist. The sampling criteria used a variable sampling methodology with a 90 percent confidence level and 10 percent precision. Our universe included 2,875 families that received more than $35 million in housing assistance payments. We only reviewed 65 of the 67 sample cases because the Authority was unable to locate two tenant files before the completion of our fieldwork. To be conservative we treated the two files that were not reviewed as having no discrepancies.

The Authority made ineligible payments in the amount of $58,988 for the period October 1, 2005, through September 30, 2007. The $58,988 represents the sum of overpayments ($30,759) from incorrect housing assistance and utility allowance calculations in 37 cases and ineligible payments ($28,229) stemming from the Authority's failure to execute housing assistance contracts within the required timeframe in six cases. Three of the six cases were included in the 37 cases in which we found erroneous housing assistance and utility allowance calculations. Because of this overlap, we only associated ineligible payments with 40 of 65 cases reviewed.

Exh 18

Unless the Authority improves its housing assistance payment calculation process, as well as its execution of housing assistance contract processes, we estimate that it could make $926,312 in ineligible housing assistance and utility allowance payments over the next year.

To determine our estimate of $926,312 in potential ineligible payments over the next year, we used difference estimation techniques to project the sample results. This yielded a point estimate of $5,679,288 in housing assistance and utility allowance overpayments during our two year audit period with overpayments of $1,852,625 and $9,505,951 based on the upper and lower limits respectively. For reporting purposes, we annualized the upper limit ($1,852,625 divided by the audit period of 2 years) to obtain a one year estimate of $926,312. The upper limit provides the most conservative estimate of potential ineligible payments over the next year. The estimate is presented solely to demonstrate the annual amount of program funds that could be put to better use if the Authority implements our recommendations. While these benefits would recur indefinitely, we were conservative in our approach and only included the initial year in our estimate.

# INTERNAL CONTROLS

Internal control is an integral component of an organization's management that provides reasonable assurance that the following objectives are being achieved:

- Effectiveness and efficiency of operations,
- Reliability of financial reporting, and
- Compliance with applicable laws and regulations.

Internal controls relate to management's plans, methods, and procedures used to meet its mission, goals, and objectives. Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations. They include the systems for measuring, reporting, and monitoring program performance.

**Relevant Internal Controls**

We determined the following internal controls were relevant to our objective:

- Program operations – Policies and procedures that management has implemented to reasonably ensure that it calculated housing assistance payments correctly, properly maintained documentation in its tenant files, and properly administered its Family Self-Sufficiency program.

- Validity and reliability of data – Policies and procedures that management has implemented to reasonably ensure that valid and reliable data are obtained, maintained, and fairly disclosed in reports.

- Compliance with laws and regulations – Policies and procedures that management has implemented to reasonably ensure that resource use is consistent with laws and regulations.

We assessed the relevant controls identified above.

A significant weakness exists if internal controls do not provide reasonable assurance that the process for planning, organizing, directing, and controlling program operations will meet the organization's objectives.

**Significant Weakness**

Based on our audit, we believe the following item is a significant weakness:

Exh 18

- The Authority did not implement sufficient controls to ensure compliance with HUD requirements and/or its program administrative plan with regard to calculations of households' housing assistance and utility allowance payments, execution of housing assistance contracts, and tenant file documentation (see finding).

Exh 18

# APPENDIXES

## Appendix A

### SCHEDULE OF QUESTIONED COSTS
### AND FUNDS TO BE PUT TO BETTER USE

| Recommendation number | Ineligible 1/ | Unsupported 2/ | Funds to be put to better use 3/ |
|---|---|---|---|
| 1A | $58,988 | | |
| 1B | | | $3,376 |
| 1C | | $26,596 | |
| 1D | | | $926,312 |
| **Totals** | **$58,988** | **$26,596** | **$929,688** |

1/    Ineligible costs are costs charged to a HUD-financed or HUD-insured program or activity that the auditor believes are not allowable by law; contract; or federal, state, or local policies or regulations.

2/    Unsupported costs are those costs charged to a HUD-financed or HUD-insured program or activity when we cannot determine eligibility at the time of the audit.  Unsupported costs require a decision by HUD program officials.  This decision, in addition to obtaining supporting documentation, might involve a legal interpretation or clarification of departmental policies and procedures.

3/    Recommendations that funds be put to better use are estimates of amounts that could be used more efficiently if an Office of Inspector General (OIG) recommendation is implemented.  This includes reductions in outlays, deobligation of funds, withdrawal of interest subsidy costs not incurred by implementing recommended improvements, avoidance of unnecessary expenditures noted in preaward reviews, and any other savings which are specifically identified.  In this instance, if the Authority implements our recommendations, it will use $3,376 in program funds to serve its purpose of assisting eligible families and prevent approximately $926,300 in program funds from being spent on ineligible housing assistance and utility allowance payments annually.



## Appendix B

# AUDITEE COMMENTS AND OIG'S EVALUATION

**Ref to OIG Evaluation**          **Auditee Comments**



## DELAWARE COUNTY
## HOUSING AUTHORITY

1855 CONSTITUTION AVENUE, P.O. BOX 100, WOODLYN, PA 19094-0100
610-876-2521      FAX # 610-490-8246      TDD # 610-876-3341

July 31, 2008

**FEDEX AIRBILL NUMBER**
**8576 1487 2358**

John P. Buck
Regional Inspector General for Audit
Philadelphia Regional Office, 3AGA
U. S. Department of Housing and Urban Development
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19107-3380

RE:    Draft Audit Report for Delaware County Housing Authority

Dear Mr. Buck:

During our entrance conference for this Audit I stated that Delaware County
Housing Authority (DCHA) was entering into this process with a positive outlook that it
would result in constructive recommendations that would help DCHA improve what we
believe to be was a well run Housing Choice Voucher Program. We did not expect that
after a ten month review of our program it would result in a finding of no errors in our
administration of the program. We believe that the draft report closely matches our
expectations. Having read three audit reports of other similar size Housing Choice
Voucher Programs in other parts of the country and our report which contains only one
Finding confirms my belief that DCHA operates a good Housing Choice Voucher
Program.

The comments below do not refute any facts contained in the report but provide a
status report on actions planned and/or implemented as a result of our consultation with
Regional Inspector General Staff throughout the Audit regarding the one finding and
recommendation contained in the report.

| MEMBERS | EXECUTIVE DIRECTOR AND SECRETARY |
|---|---|
| ANTHONY J. GROSSO, CHM. | LAWRENCE E. HARTLEY, P.H.M. |
| PAUL G. MATTUS | |
| JAMES J. MARKS | SOLICITOR |
| FRANCIS J. BERNHARDT, JR. | STEPHEN J. POLAHA, ESQ. |

DELAWARE COUNTY, AN EQUAL OPPORTUNITY HOUSING AUTHORITY

15

Page Two
Mr. Buck
July 31, 2008

1. The Authority incorrectly calculated Housing Assistance and Utility Allowance
Payments.

With respect to zero income tenants DCHA is improving its monitoring of zero
income recertifications by the Director of Housing Choice Voucher Programs
reviewing with staff every month a report of zero income clients indicating the
date of their last recertification. The interim recertification will continue to be
conducted every ninety (90) days until the client reports income.

With respect to the conduct of recertifications, DCHA is drafting a change to its
Administrative Plan to eliminate interim recertifications and conduct only annual
recertifications. HUD regulations do not require interim recertifications and as a
result of declining administrative fees many Housing Authorities have
discontinued interim recertifications. DCHA will continue to conduct thorough
annual recertifications requiring clients to report all changes at that time.

The report indicates that DCHA established and implemented a quality control
review process as required but must improve the follow up on weaknesses
revealed by those reviews. Housing Choice Voucher Specialists and the Director
of Housing Choice Voucher Programs are informed of all deficiencies by quality
control reviews immediately and are expected to follow up. In the future the
Director of Housing Choice Voucher Programs will closely monitor these reviews
and provide both positive and negative feedback individually to staff members
immediately following the review. The Director will then review common and
frequent errors with the entire staff at weekly departmental meetings.

2. The Authority made ineligible payments because it did not execute Assistance
Contracts as required.

The authority's administrative plan and HUD requirements at 24 CFR {Code of
Federal Regulations} 982.305 state that the Authority must make a best effort to
ensure that the housing assistance contract is executed before the beginning of the
lease term. Although DCHA believes that it did make a best effort to ensure
compliance, due to the staff levels as indicated in the audit report "This situation
may have created some difficulty for the authority in terms of its case load
management" those efforts may not have been adequate. The Director of Housing
Choice Voucher Program has amended an internal rental integrity monitoring
review checklist to include the following question.

*Exh 18*

Page Three
Mr. Buck
July 31, 2008

Was the contract approved within 60 days of the effective date of the lease?  If no,
send disapproval notice.  Do not process the file.

3. The Authority lacked documentation to support $67,522 in payments.

**Comment 1**

The Draft report indicated that DCHA could not retrieve six (6) required files
from its archives. During the exit conference four (4) of the six (6) files were
provided to the Auditor who agreed to review them.

4. The Authority needs to strengthen its controls.

In addition to monitoring internal quality control processes noting possible
weaknesses, the Director of Housing Choice Voucher Program will meet with
each employee individually every other week to review all issues that may arise
dealing with the integrity of the Housing Choice Voucher Program.  Items to be
discussed include but not limited to interviewing techniques, acceptance of all
lease related documents and learning how to navigate through all of the
Department of Housing Urban Developments electronic systems.

5. The Authority needs to evaluate its staff levels.

The Authority continuously monitors its staffing levels and compares them with
industry standards. We believe when staffing is at 100% of planned levels it is
adequate and within industry standards. DCHA's Housing Choice Voucher
Specialist's do not take applications, select new clients or issue new Vouchers.
These tasks are handled by Application and Admission Specialist's in the
Admission, Compliance and Special Programs Department.

Unfortunately as the report indicates during the Audit period the Authority lost
three (3) Housing Choice Voucher Specialists and hired three (3) replacements.
Subsequent to the Audit period all new and uncertified Housing Choice Voucher
Specialist's attended training and took a proficiency exam. Training was
conducted by Nan McKay on June 24th through June 26th. All employees who
attended passed.

*Exh 18*

Page Four
Mr. Buck
July 31, 2008

If you have any questions regarding our response please let us know.

Sincerely,

Lawrence E. Hartley, P.H.M.
Executive Director

LEH/jcs

Cc:   Laura D. Blackburn
      Maureen C. Donegan
      Pamela R. Haines
      Lynn Cox
      Dennis Bellingtier

## **OIG Evaluation of Auditee Comments**

**Comment 1**    Following our exit conference on July 10, 2008, we reviewed the four additional files provided by the Authority and issued an updated draft report to the Authority on July 21, 2008, which only reflected unsupported payments totaling $26,596. However, the Authority's response to the finding appears to be based on the initial version of the draft report. This report reflects the updated amount of the Authority's unsupported payments as reported in our revised draft issued to the Authority on July 21, 2008.

*Exh 19*

Ms. Blackburn;

As of today the 6th, I have not heard from your office or Mr. Karpov in regards to the Mutual Termination Agreement. He told me that you or someone at the DCHA were going to be the one(s) to prepare it. In light of this, I have prepared a termination agreement and I think that you will find this sample to be fair to everyone concerned. Also, as you know an inspection of this unit was performed on the 3rd and I found it unusual that the inspector did not have a list or did not write anything down for the inspection report. I am requesting a copy of the inspection report for my records. Would you send that to me ASAP.

The eviction complaint filed by Mr. Karpov was dismissed on the 4th.

Thank-you;

Earlando Samuel

## MUTUAL TERMINATION AGREEMENT

This Lease Termination Agreement is entered into by and between *Vladimir Karpov, of Chestnut Hill Realty*, a company with an address of P.O. Box 7135, Newark, De., 19714 ("Landlord"), and *Earlando Samuel,* an individual with an address of 1146-B Holland Street, Crum Lynne, Pa. 19022 ("Tenant").

Background

By a certain lease dated August 13th, 2002 (the "Lease"), Landlord leased to Tenant the premises described as follows: A one bedroom standard apartment unit (the "Premises").

*Landlord and Tenant both desire to terminate and cancel the Lease.*

Therefore, in consideration of the mutual covenants contained herein and other valuable consideration received, and with the intent to be legally bound, *Landlord and Tenant agree as follows:*

1. *Landlord and Tenant hereby mutually terminate and cancel the Lease* effective no longer than sixty (60) days after the execution of this agreement. Tenant hereby releases to Landlord all right, title and interest in and to the Premises that Tenant may have acquired by reason of the Lease.

2. *Tenant will vacate the Premises and surrender possession to Landlord* on the effective date hereof, free of all occupants. Landlord will accept this surrender. The Premises shall be delivered to Landlord in the same condition as they were at the commencement of the Lease, reasonable wear and tear excepted.

3. *This Lease Termination Agreement shall be binding* upon and shall inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

4 *Additional Provisions*:

Delaware County Housing Authority will submit Earlando Samuel's voucher information to the Cecil County Housing Authority no longer than one (1) business day after execution of this document (Mutual Termination Agreement).

*Ex h*

**IN WITNESS WHEREOF,** this Lease Termination Agreement is executed

on the_____day of_____, 2003.

Executed in the
presence of:                                          LANDLORD

_____              _____
(Signature of witness)                             VLADIMIR KARPOV

                                                        TENANT

                                                  _____
                                                  EARLANDO SAMUEL

**IV.     Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.   "See Attached"

**V.     Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation.

"See Attached"

## IV. FIRST AMENDED INJURIES

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.

1. I had been suffering from and treated for a panic disorder (DSM-5 An abrupt surge of intense fear or intense discomfort that reaches a peak within minutes and during which time four or more of the following symptoms occur. Palpitations, pounding heart, or accelerated heart rate, Sweating, Trembling or shaking, Sensations of shortness of breath or smothering, Feeling of choking, Chest pain or discomfort, Nausea or abdominal distress, Feeling dizzy, unsteady, lightheaded, or faint, Derealization (feelings of unreality) or depersonalization (being detached from oneself), Fear of losing control or "going crazy", Fear of dying, Paresthesias (numbness or tingling sensation), Chills or hot flushes.) with agoraphobia (A marked fear or anxiety about two (or more) of the following five situations: Using public transportation, Being in open spaces, Being in enclosed spaces (e.g., shops, theaters, cinemas), Standing in line or being in a crowd, Being outside the home alone. The agoraphobic situations almost always provoke fear or anxiety. The fear or anxiety is out of proportion to the actual danger posed by the agoraphobic situations and to the sociocultural context. The fear, anxiety, or avoidance is persistent, typically lasting 6 months or more. The fear, anxiety, or avoidance causes clinically significant distress or impairment in important areas of functioning. The situations are avoided (e.g., travel is restricted) or else are endured with marked distress or with anxiety about having a panic attack or panic-like symptoms, or require the presence of a companion.) approximately 17 years ago and as a direct and proximate cause the defendants' outrageous and purposeful acts caused me such severe emotional distress that triggered a relapse of the panic disorder with agoraphobia. I'm back taking .5 milligrams x 3 of Klonopin (Clonazepam) is a medication that belongs to the drug class benzodiazepine. Klonopin is available as a generic drug, and is prescribed for the treatment of panic disorder with agoraphobia.

## V. FIRST AMENDED RELIEF

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation.

## 1.COMPENSATORY DAMAGES – TO BE DIVIDED EQUALLY BETWEEN THE DEFENDANTS

1. **Loss Of Use – Household and exercise  items** that I had to give away due to the lack of space moving from a two bedroom unit to a one bedroom efficiency - **$2400.00 (Twenty Four hundred dollars) – Replacement cost**
2. **Loss Of Use – Housing -** Two bedroom Housing Choice Voucher for the accommodation for my Live In Aide- Housing Costs For Two Bedroom Apartment In Glen Mills, Delaware County is: **$2,852.00 per month** as of June 11, 2022 x 12 yearly = **34,224.00 yearly x 22 year Life Expectancy = $752,928.00** with average inflation  rate of 2.5% and cumulative inflation rate of 72.16% =**$1,328,625.00 (One Million,three hundred and twenty eight thousand, six hundred and twenty five dollars) – Replacement cost**
3. **Loss Of Use – Duties Of My Live In Aide -**The definition of a live-in aide is recorded in 24 CFR Section 5.403 which states that a live-in aide is a person who resides with one or more elderly persons, near-elderly persons or persons with disabilities and who is: (1) determined to be essential to the care and well-being of the persons; (2) is not obligated for the support of the persons; and (3) would not be living in the unit except to provide the necessary supportive services. It should be noted that the definition applies to a specific person. In accordance with this definition, a live-in aide is not a member of the assisted family and is not entitled to the HCV as the remaining member of the tenant family.

## WHAT WERE/ARE THE DUTIES OF  MY LIVE IN AIDE?

My live-in Aide assists me with dressing, exercise, bathing, grooming, and toileting services. My Aide offered essential services such as laundry, light housekeeping, meal preparation, shopping, and more. He gave general health care services such as administering medicine, appointment reminders, overseeing medication usage, and overseeing prescriptions usage. Moreover, he gave personal supervision services, whereby he provided general supervision and constant companionship. Also, he oriented me due to my mild cognitive disorder/dementia and relayed the doctor's information to my other family members.

## Costs To Replace The Services Of My Live In Aide

Pennsylvania **$24.00 Hourly X 30 Monthly = $17,472 x 12 =**

1

**$209,664 Yearly x 22 year Life Expectancy = $4,612,608.00** with average inflation rate of 2.5% and cumulative inflation rate of 72.16% = **$6,886,284.00 (Six million, eight hundred and eighty six thousand, two hundred and eighty four dollars) – Replacement cost**

## 2.THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS– TO BE DIVIDED EQUALLY BETWEEN THE DEFENDANTS

Intentional Infliction of Emotional Distress (IIED) is a tort that occurs when one acts in a manner that intentionally or recklessly causes another to suffer severe emotional distress, such as issuing the threat of future harm.

**Prima Facie Case**

- The defendant acts
- The defendant's conduct is outrageous
- The defendant acts purposely or recklessly, causing the victim emotional distress so severe that it could be expected to adversely affect mental health
- The defendant's conduct causes such distress

### HOW DID/DOES THE DEFENDANTS' CONDUCT AFFECT ME EMOTIONALLY

I had been suffering from and treated for a panic disorder (DSM-5 An abrupt surge of intense fear or intense discomfort that reaches a peak within minutes and during which time four or more of the following symptoms occur. Palpitations, pounding heart, or accelerated heart rate, Sweating, Trembling or shaking, Sensations of shortness of breath or smothering, Feeling of choking, Chest pain or discomfort, Nausea or abdominal distress, Feeling dizzy, unsteady, lightheaded, or faint, Derealization (feelings of unreality) or depersonalization (being detached from oneself), Fear of losing control or "going crazy", Fear of dying, Paresthesias (numbness or tingling sensation), Chills or hot flushes.) with agoraphobia (A marked fear or anxiety about two (or more) of the following five situations: Using public transportation, Being in open spaces, Being in enclosed spaces (e.g., shops, theaters, cinemas), Standing in line or being in a crowd, Being outside the home alone. The agoraphobic situations almost always provoke fear or anxiety. The fear or anxiety is out of proportion to the actual danger posed by the agoraphobic situations and to the sociocultural context. The fear, anxiety, or avoidance is persistent, typically lasting 6 months or more. The fear, anxiety, or avoidance causes clinically significant distress or impairment in important areas of functioning. The situations are avoided (e.g., travel is restricted) or else are endured with marked distress or with anxiety about having a panic attack or panic-like symptoms, or require the presence of a companion.) approximately 17 years ago and as a direct and proximate cause of the defendants' outrageous and purposeful acts caused me such severe emotional distress that triggered a relapse of the panic disorder with agoraphobia. I'm back taking .5 milligrams x 3 of Klonopin (Clonazepam) is a medication that belongs to the

drug class benzodiazepine. Klonopin is available as a generic drug, and is prescribed for the treatment of panic disorder with agoraphobia.  -  **$4,000,000.00 (Four Million Dollars) - Damages**

3. **PUNITIVE DAMAGES – Damages** that are awarded as punishment for the defendant's serious misconduct and as a means of deterring the defendant and others from such behavior. The defendant engaged in an intentional tort and/or engaged in wanton and willful misconduct that caused me severe physical pain and severe emotional distress. the defendants' criminal and civil wrongdoings affected me in a negative way medically, emotionally, spiritually, psychology and financially -**$4,000,000.00 (Four Million Dollars) – TO BE DIVIDED EQUALLY BETWEEN THE DEFENDANTS**

**4. REASONABLE ATTORNEY FEES**

**5. THE DEFENDANTS' ARE "JOINTLY AND SEVERALLY" LIABLE**

**6. ANY OTHER RELIEF THAT THE COURT DEEMS TO BE JUST AND FAIR**

**TOTAL – $16,217,309.00 – Sixteen million, two hundred seventeen thousand and three hundred and nine dollars.**

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this _____ day of _____ , 20_____.


Signature of Plaintiff _____

Mailing Address _____

_____

_____

Telephone Number _____

Fax Number *(if you have one)* _____

E-mail Address _____


<u>Note</u>:    All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.


<u>For Prisoners:</u>

I declare under penalty of perjury that on this _____ day of _____ , 20_____, I am delivering this complaint to prison authorities to be mailed to the Clerk's Office of the United States District Court for the Eastern District of Pennsylvania.


Signature of Plaintiff: _____

Inmate Number _____

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _29 4_ day of _December_____ , 20 _22_.

Signature of Plaintiff _____

Mailing Address   207 Parker Place_____

_____Glen Mills_____

_____Pennsylvania 19342_____

Telephone Number   610 241 7527_____

Fax Number *(if you have one)* _____

E-mail Address   easee2@gmail.com_____

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

For Prisoners:

I declare under penalty of perjury that on this _____ day of _____ , 20_____ , I am delivering this complaint to prison authorities to be mailed to the Clerk's Office of the United States District Court for the Eastern District of Pennsylvania.

Signature of Plaintiff: _____

Inmate Number _____

EARLANDO SAMUEL
297 PARKER PLACE
GLEN MILLS, PA 19342

RECEIVED
JAN - 3 2023

U.S. M.
X-RAY.

CLERK OF COURT, EDPa
JAMES A BYRNE, U S COURTHOUSE
ROOM 2609
601 MARKET STREET
PHILADELPHIA PA 19106

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
CERTIFIED MAIL

7022 0410 0000 1582 4958



RDC 21

19106



U.S. POSTAGE PAID
PM
C-PDS FORD, PA
1691
DEC 29, 22
AMOUNT
$16.80
R2308M143398-30