**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **EARLANDO SAMUEL,**     **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **THE DELAWARE COUNTY HOUSING AUTHORITY, LAURA BLACKBURN, DAWN WARE, CHRISTINA PRO, INGERMAN PROPERTY MANAGEMENT, RASHIDA SMITH, RYANN WILLIAMS, NEFERTITI RIVERS, TERRI HARDIN, GREG WARD, and CATHERINE CUENY,**     **Defendants.** | **NO. 22-2451** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Earlando Samuel, proceeding *pro se*, intended to lease a two-bedroom apartment using a housing voucher administered by Defendant Delaware County Housing Authority ("DCHA") in a building managed by Defendant Ingerman Property Management ("Ingerman").[1] He alleges that DCHA and four of its employees—Laura Blackburn, Dawn Ware, Christina Pro, and Catherine Cueny (collectively, "DCHA Defendants"), as well as Ingerman and five of its employees—Rashida Smith, Ryann Williams, Nefertiti Rivers, Terri Hardin, and Greg Ward (collectively, "Ingerman Defendants") engaged in a "bait-and-switch" scheme to trick him into leasing a one-bedroom apartment instead.  He also alleges that after he moved in, Defendants harassed and retaliated against him.  Samuel brings federal and state law claims alleging: (1) violations of the Fair Housing Act ("FHA"); (2) violation of 24 C.F.R. § 982.316, concerning the approval of live-in aides by public housing agencies; (3) violations of the Americans with

---

[1] Ingerman represents in its Motion that although Samuel names it as "Ingerman Property Management" in his Amended Complaint, its "correct legal name is Ingerman Management Company."

Disabilities Act ("ADA"); (4) violations of the Federal Trade Commission Act ("FTC Act"); (5)

violations of 18 U.S.C. §§ 241 and 2261A; (6) violations of the Pennsylvania Unfair Trade

Practices and Consumer Protection Law ("UTPCPL"); and (7) intentional infliction of emotional

distress.  Samuel has filed a Motion for Judgment on the Pleadings pursuant to Federal Rule of

Civil Procedure 12(c); the DCHA Defendants and the Ingerman Defendants have each filed

Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that

follow, Samuel's Motion will be denied; DCHA Defendants' Motion will be granted in part; and

Ingerman Defendants' Motion will be granted in full.

## I.   BACKGROUND[2]

Samuel is a 70-year-old black man who suffers from osteoporosis, degenerative

joint disease, and a mild cognitive disorder.  Due to his conditions, Samuel's primary

physician advised him in 2012 that a live-in aide was "medically necessary"; Samuel

requires housing with at least two bedrooms to accommodate the aide.  Because of

"medical determinations and psychological reports, diagnosis(s} [sic], prognosis(s) and

treatment plans made by medical doctors, psychologists, therapists and the determination

of 'disability' by the Social Security Administration," the Delaware State Housing

Authority approved a two-bedroom housing voucher for Samuel in 2012.  Samuel further

either prefers or requires a first-floor apartment because stairs and inclines cause him

"great pain and suffering lasting for days."

In 2016, Samuel "ported," or transferred, his voucher to the New Castle Housing

Authority.  Subsequently, the New Castle County Housing Authority issued Samuel a

---

[2] These facts are drawn from the Amended Complaint and its attached exhibits and, for the purposes of the motion to dismiss, will be taken as true.  *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  However, where Samuel's "own exhibits contradict [his] allegations in the complaint, the exhibits control."  *Vorchheimer v. Philadelphia Owners Assoc.*, 903 F.3d 100, 112 (3d Cir. 2018).

Housing Choice Voucher ("HCV") for a two-bedroom apartment on October 4, 2019.

These vouchers enable the holder to:

> choose[] a decent, safe and sanitary unit to live in.  If the owner agrees to lease the unit to the family under the housing choice voucher program, and if the PHA [public housing agency] approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

After viewing an advertisement for an available two-bedroom apartment at the Ingerman Birchwood at Concord Point building stating that HCVs would be accepted, Samuel submitted an email application on February 21, 2019.  He received a reply email on September 18 from Defendant Ryann Williams, the building's assistant property manager, inviting him to tour two-bedroom apartments at the property.  Samuel alleges that this was the beginning of a duplicitous scheme by the DCHA and Ingerman Defendants to convert his HCV into a one-bedroom voucher and force him to move into an unsuitable second-story one-bedroom apartment.

Following her email, Williams called Samuel on October 28 to inform him he had been approved for a two-bedroom apartment.  Samuel met with her at Ingerman's office the next day.  While Williams and Samuel waited "for a nurse friend" of his to arrive, they discussed his experiences with housing vouchers.  During that discussion, Williams told Samuel he "didn't look disabled."

After completing a new application, Samuel asked to see the apartment.  Williams told him it was unavailable for viewing, but offered to show him a one-bedroom unit on the first floor instead.  At Williams' suggestion, they walked along an exercise trail on the development to view greenery surrounding the property.  After walking approximately twenty feet, Samuel developed "aches and pain," and told Williams and his friend to go on ahead.  The group then viewed the first-floor unit, which Samuel told Williams "was workable in the 2 bedroom

3

configuration."

On November 5, Samuel had an intake appointment with Defendant Laura Blackburn, then Director of the DCHA, and Defendant Catherine Cueny, a DCHA Applications and Admissions Specialist.  That same day, DCHA issued Samuel a new voucher.  The voucher lists Blackburn as the authorizing DCHA official and is signed by Defendant Dawn Ware.  Samuel's signature also appears on the voucher, which he alleges is a "fabrication."[3]  The voucher bears a different identifying number than Samuel's original New Castle County HCV, but lists the same October 4, 2019 issue date.  Unlike the New Castle County HCV, the voucher issued by DCHA entitles Samuel to a one-bedroom unit.

On November 27, 2019, Samuel met with Defendant Rashida Smith, an Ingerman Property Manager, to sign a lease.  He realized after the fact that the lease was for a one-bedroom apartment on the second floor.

Although he moved into the apartment, Samuel continued to raise the issue of reinstating his two-bedroom voucher with DCHA employees.  On August 8, 2021, he emailed Blackburn regarding a response received from Defendant Christina Pro, Samuel's DCHA caseworker, about his voucher and the availability of a live-in aide.  In her email, Pro told Samuel:

> [Although] you came into our Housing Authority with a 2-bedroom voucher DCHA's policy states you are only entitled to a 1 bedroom.  Each Housing Authority has their own administration plan.  Your unit is only 1 bedroom.  If you decide to add a live-in aide and your voucher is increased to a 2 bedroom then you would need to move.  We cannot pay for the payment standard for a 2 bedroom on

---

[3] Although not entirely clear, Samuel may also be alleging that if he did in fact sign the HCV, he was improperly induced to do so by unspecified Defendants.  He alleges that he had no choice but to accept the one-bedroom unit as it was either that "or the street," and asserts that he took the apartment under "undue influence."  In explaining the term "undue influence," he provides the example: "a personal caretaker might unduly influence an elderly person experiencing dementia, amnesia, or Alzheimer's disease in order to compel the elderly person to alter a will to favor the caretaker."  He then states that at the time his HCV was ported out to DCHA, he was not yet on proper medication for his cognitive disorder.

a 1-bedroom unit.

She then sent him DCHA's live-in aide policy.

Samuel forwarded Pro's response to Blackburn.  In his email, he informed her that he believed his two-bedroom voucher "was wrongfully taken" and asked for her assistance resolving the voucher issue.  Blackburn advised Samuel that "if you require a live-in aid[e], you will need to provide documentation from a medical professional stating you need a live-in aide." Information on the aide would then need to be submitted to DCHA for background checks.  If the live-in aide met "all eligibility requirements," Blackburn informed him that he would have to vacate his one-bedroom apartment for a new voucher to issue:

> [Y]ou will need to read your lease and give proper notice to your landlord of your intent to vacate.  We will need a letter from the owner stating you are currently in compliance (i.e., rent is up to date, no lease violations and proper notice was given.) Upon receipt of the clearance letter a two Bedroom Voucher will be issued.  The above procedure is for all clients who ask to have a live-in aide, and or who wishes to move.

Samuel does not allege that he took these steps.

In response to his complaints about the downgrading of his voucher, the unsuitability of a second-floor apartment, and his need for a live-in aide, Samuel alleges the Ingerman Defendants and Pro undertook a "campaign of harassment and unfair treatment" against him after he moved in.  Samuel objects to two one-off instances of conduct: first, on December 5, 2019, Williams "demanded" information about expenditures he made and convinced him to provide four bank statements, telling him he would be found in violation of his lease if he did not.  Second, on April 1, 2020, Smith imposed a 10:30 pm television "curfew" on him after a neighbor made a noise complaint.

Samuel also objects to two categories of repeated conduct by various Defendants: (1) multiple entries into his apartment by Defendant Greg Ward, a maintenance manager for

5

Ingerman, that were either unannounced or on short notice to perform "mandatory pre-inspections" or repairs, and (2) fluctuations in his rent that resulted, in some instances, in notices that he was delinquent on his rent.  As to the first category, Samuel alleges Ward first entered his apartment unannounced on July 7, 2020.  The day prior, Samuel had received a notice at approximately 5:20 pm informing him that a "mandatory pre-inspection" in advance of an inspection required by the Township would be performed "starting the next day."  Samuel was awoken the next morning at around 9:30 am by Ward, who had entered Samuel's apartment using a master key, "hollering." [4]  Ward then returned two days later, again entering Samuel's apartment unannounced while he was asleep and this time providing no advance notice.  Ward told Samuel he was there to replace the light in the oven, a claim Samuel was skeptical of as "[t]he oven was new when I moved into the unit and I may have used the light twice."  Samuel sent a letter to Smith complaining about these intrusions on July 15, 2020, to which she responded "it won't happen again."  However, on June 20, 2021 at 9:30 am, Samuel discovered Ward, Defendant Terri Hardin, "and an unknown woman" in his apartment.  Ward told Samuel they were there to check the air filter; however, according to Samuel, they left without doing so.  These incidents caused Samuel "great alarm," "headaches," and required "treat[ment] for the symptoms of PTSD."  On August 18, 2021, Samuel sent a letter to Smith, Rivers, Hardin, and Ingerman complaining that he found these entries, which were without "consent or permission" and "due notice," to be "unbearable."  He also claimed that he had been subject to "5 'mandatory pre inspection inspections' and 4 Ingerman Concord Pointe quarterly inspections done by Greg Ward" since moving into the Birchwood at Concord Point building, but did not provide

---

[4] Samuel provides two accounts of this "pre-inspection" that differ slightly.  In the first, he was given the notice of the inspection at 5:20 pm on July 6 and woken by Ward at 9:30 am the next day.  In the second, he was given the notice at 5:15 pm and woken at 9:10 am.

additional detail as to when and under what conditions those inspections took place.

As to the second category of repeated conduct—fluctuations in his rent and subsequent delinquency notices—pursuant to his HCV, Samuel paid a portion of the monthly rent for his unit and DCHA made housing assistance payments ("HAP") for the remainder.  Samuel alleges that his portion of the rent fluctuated from $162, to $16, to "3 months of the full apartment rental amount, $2070.00," to $59, and finally to $81.  The timeline Samuel provides of these fluctuations is somewhat hard to follow.  However, combining the allegations in the body of his Amended Complaint with the supporting documentation he attaches, it appears the following sequence occurred: Samuel's payments started at $162, and at some point decreased to $16. Then on March 1, 2021, Hardin, an Ingerman assistant manager, informed Samuel that he was responsible for making three months of housing assistance payments—totaling $2,070—even though he had paid his portion of the rent on time.  Samuel emailed Pro, who was responsible for making housing assistance payments on his behalf, about the situation.  Pro responded: "I have made the correction to the Annual Reexamination.  Payment should be made around the 15th of March.  Payments will catch up at that time."  Samuel emailed Hardin to follow up on March 24. She responded later that day:

> I did receive an email from your case worker. It seems as if they didn't make the payments for you for those months ( February/ March), but they did make the payments this month for those 2 month.  I'm guessing someone was out of the office due to Covid or something happened on their end.  As far as January's payment, we actually did receive that.  Our accounting depart actually notified me of that yesterday.  So you are now in good standing.

On June 7, 2021, Samuel emailed Pro about "resolving the matter of [his] two bedroom voucher."  In response, she sent him a "Notice of Lease and Contract" raising his rental payment "368%."  Although Samuel does not specify the dollar amount his rent increased from and to, this percentage increase corresponds to an increase of $16 to $58.88.  Pro explained that the

reason for the increase was a "change in income or family composition."  Samuel sent her a response letter on June 25, informing her that "the only increase in income that [he] had was a 1.3% COLA and that there were no additions to [his] family."

Samuel filed a formal complaint on July 21, 2021 with the Pennsylvania Attorney General's office regarding "alleged wrongdoings by Christina Pro and Terri Hardin such as holding [him] responsible for the full amount of rent along [] with increasing [his] out of pocket rent."  The Pennsylvania Office of State Inspector General forwarded his complaint to the Department of Housing and Urban Development ("HUD")'s Office of the Inspector General on July 30, 2021.

Samuel next received a communication indicating that his rent had changed on October 28, 2021, when a "Self-Certification" document was delivered to his apartment.  The Self-Certification's instructions directed him that the document did "not require any income or asset verification, as you have previously been required to provide in a full certification."  Instead, Samuel was instructed to simply sign the document and return it to Ingerman's office.  One pre-filled section of the Self-Certification listed "Tenant Paid Rent" as $16.  Samuel subsequently made $16 rent payments for three months—November 2021, December 2021, and January 2022.

However, on January 20, 2022, Samuel received a "Notice of Delinquent Rent" signed by Defendant Nefertiti Rivers, an Ingerman property manager, stating that his monthly rent was $59.  The Notice also stated that he owed $129 in delinquent rent—the difference between the three payments of $16 Samuel made and three payments of $59.[5]  The Notice gave Samuel five business days "to make payment in full" or Ingerman would "pursue remedies to the extent

---

[5] The Notice arrives at this total a different way, stating that Samuel owed $70 for November and December combined, plus $59 for January.  Why the delinquent amounts are allocated this way, rather than $43 for each month (the difference between $59 and $16), is not explained by the Notice.

permitted by law."  Samuel paid "under protest."[6]

On April 12, 2022, Samuel received a "Five Day Notice of Delinquent Rent."  This Notice stated that Samuel owed $248—a $22 rental balance for the current month, a $176 rental balance for the months of August 2021 through March 2022, and a $50 late fee.  Samuel sent Rivers "a letter of dispute and inquired as to how she arrived at those figures."  The next day, she sent him a document dated March 10, 2022 titled "Section 8 Housing Voucher Program – Notice of change to Lease and Contract."  The document states that the "Housing Voucher Contract and/or Lease Agreement" governing Samuel's unit had been amended, and Samuel's portion of the rent had been increased from $59 to $81 and DCHA's portion had been reduced from $652 to $630.  The reason given was an "[i]nterim change in family income and/or composition."  The notice further states that the change "will be effective from 08/01/2021."  Samuel received no notice of this change prior to the April 12 Notice of Delinquent Rent and does not recall providing Defendants with a new income certification notifying them of any change in his income.  Again, Samuel paid the demanded amount "under protest and duress."

In addition to his complaints to Defendants, Samuel submitted a formal complaint to the HUD Office of the Inspector General on May 4, 2022 regarding their conduct.  He sent a "follow up" on June 6, 2022.  Finally, on June 8, 2022, Samuel filed a police report with the Pennsylvania State Police.

---

[6] Samuel also alleges that he "hand delivered two checks, one for the usual $59.00 the other for the $16.00, along with an inquiry letter asking which one is the correct amount of my out of pocket to the office, I told them to use the check for either the 16.00 or the 59.00 for my out of pocket rent for that month and remit to me the other.  The check in the amount of 16.00 was given back to me."  It is unclear when Samuel did this, and this allegation is inconsistent with his account one paragraph before, in which he alleges he paid $16 for three months.

Samuel alleges that he paid $16 for three months, then received a Notice of Delinquent Rent, which he attaches as "Exhibit 10."  He then alleges he delivered the two checks, had the $16 check returned, and received a Notice of Delinquent Rent that he attaches as "Exhibit 11."  However, the Exhibits 10 and 11 are identical—they bear the same date (January 18, 2022), demand the same amount of delinquent rent, and include the same handwritten annotations.

## II.      PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

Samuel has filed Motions for Judgment on the Pleadings pursuant to Federal Rule of

Civil Procedure 12(c) against both the DCHA Defendants and the Ingerman Defendants.

Because these motions were filed prematurely, they will be denied.  A party may file a Rule

12(c) motion "[a]fter the pleadings are closed," Fed. R. Civ. P. 12(c), which occurs after a

complaint and answer have been filed.  Fed. R. Civ. P. 7(a); *Moco Invs., Inc. v. United States*,

362 F. App'x 305, 307 n.4 (3d Cir. 2010); 5C Charles Alan Wright & Arthur R. Miller, *Federal*

*Practice & Procedure* § 1367 (3d ed. 2023) ("[T]he plaintiff cannot move under Rule 12(c) until

after an answer has been filed[.]").  Samuel argues that pleadings are closed here because

Defendants are past their deadline to file Answers to his Amended Complaint.  They are not—

Defendants have filed motions to dismiss under Rule 12 and are not required to file Answers

until after the Court rules on those motions.  Fed. R. Civ. P. 12(a)(4).  As Samuel filed his 12(c)

Motions before pleadings closed, they will be denied.

## III.      DEFENDANTS' MOTIONS TO DISMISS

The DCHA and Ingerman Defendants both filed Motions to Dismiss Samuel's Amended

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Samuel filed terse Oppositions

to each citing no legal authority.  In response to DCHA's Motion, Samuel provided a single

sentence of argument: "the claim[s] attacked do sufficiently allege a claim for relief."  In

response to Ingerman's Motion, he repeated this argument and added one further assertion: that

the Motion is premature because "[t]his is a factual dispute that ultimately needs to be resolved

by a Jury rather than an issue of law for the Court to decide upon."  These responses do not

comply with this Court's Local Rule 7.1(c), which requires motions to "be accompanied by a

brief containing a concise statement of the legal contentions and authorities relied upon in

support." *See Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp.2d 506, 511 n.8 (E.D. Pa. 2007)

("Courts in this District have consistently held the failure to cite any applicable law is sufficient

to deny a motion as without merit. . . .  These same rationales applicable to briefs in support of

motions are equally applicable to opposition briefs.").  However, in light of Samuel's *pro se*

status, Defendants' arguments are analyzed below.

### A.   Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  At this stage,

the Court must "construe the complaint in the light most favorable to the plaintiff, and determine

whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of

Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  Yet "the tenet that a court must accept as true all

of the allegations contained in a complaint is inapplicable" to "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements[.]"  *Iqbal*, 556 U.S. at

678.  In deciding a motion to dismiss, the Court looks to "the allegations contained in the

complaint, exhibits attached to the complaint and matters of public record."  *Schmidt v. Skolas*,

770 F.3d 241, 249 (3d Cir. 2014).

Additionally, "a *pro se* complaint, however inartfully pleaded, must be held to less

stringent standards than formal pleadings drafted by lawyers," and Samuel's Amended

Complaint must therefore be "liberally construed."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

(quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  In addition to liberally construing

Samuel's Complaint, the Court must "apply the applicable law, irrespective of whether" he "has

mentioned it by name."  *Holley v. Dep't of Veteran Affs.*, 165 F.3d 244, 248 (3d Cir. 1999).

### B.  Discussion

#### i.  *FHA Claims*

Although pled in a slightly indirect manner, Samuel's first claim alleges violations of

Section 818 of the Fair Housing Act, codified at 42 U.S.C. § 3617.  Samuel does not directly

reference Section 3617, but instead quotes sections of 24 C.F.R. § 100.400—HUD regulations

interpreting Section 3617.  Samuel citations to the regulations emphasize particular phrases by

bolding them as follows:

> **Conduct made unlawful under this section** [Section 3617] **includes** . . . (1)
> **Coercing a person** either orally, in writing, or **by other means**, to deny or limit
> the benefits provided that person in connection with the sale or rental of a dwelling
> or in connection with a residential real estate-related transaction because of . . .
> **handicap**"
> . . .
> (2) . . . **interfering** with persons in their enjoyment of a dwelling because of the . .
> . **handicap** . . . of such persons.
> . . .
> (5) **Retaliating against any person because that person has made a complaint**,
> testified, assisted, **or participated in any manner in a proceeding under the Fair
> Housing Act**.

24 C.F.R. § 100.400(c) (emphasis added).

Section 3617 establishes that:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in
> the exercise or enjoyment of, or on account of his having exercised or enjoyed, or
> on account of his having aided or encouraged any other person in the exercise or
> enjoyment of, any right granted or protected by section 3603, 3604, 3605,
> or 3606 of this title.

42 U.S.C. § 3617.

Reading Samuel's bolded excerpts of 24 C.F.R. § 100.400 in light of the rights

protected Section 3617, Samuel's Amended Complaint is construed to allege that Defendants violated 42 U.S.C. § 3617 by interfering with his rights under 42 U.S.C. § 3604(f), which makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter" or "[t]o discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . . that person[,]" and by retaliating against him.

Specifically, he alleges that Defendants violated Section 3617 by downgrading his HCV from a two-bedroom to a one-bedroom apartment and perpetrating a "scheme" to trick him into an unsuitable one-bedroom apartment on the second floor.  He also alleges that after he moved in, Defendants began "a campaign of harassment" in response to his complaints about his voucher and apartment.

### a.  Statute of Limitations

Defendants first argue that portions of Samuel's allegations cannot serve as the basis for an FHA claim because they are barred by the statute of limitations.  Under the FHA, "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last. . . . "  42 U.S.C. § 3613(a)(1)(A).

Samuel filed his initial Complaint in this case on June 21, 2022, and therefore cannot base his FHA claim on conduct that occurred prior to June 21, 2020.  This includes conduct relating to the reissuance of his voucher by DCHA and the execution of the lease with Ingerman, which occurred in October and November 2019.  It also includes allegations that Defendants

Williams and Smith harassed Samuel by coercing him into turning over bank statements and imposing a "TV curfew," respectively.[7]

### b. Conduct Occurring After June 21, 2020

Samuel alleges three categories of conduct occurring within the limitations period violated Section 3617: (1) Defendant Greg Ward's unannounced or short-notice entries into his apartment; (2) fluctuations in his rent; and (3) resulting notices of delinquent rent.  As pled, this alleged conduct is insufficient to state a claim for violation of Section 3617 because Samuel has not established it occurred "because of" a handicap.

"A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed 'any right granted or protected by' Sections 3603-3606; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct."  *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 112-13 (3d Cir. 2017).[8]  As explained above,

---

[7] Courts have interpreted the phrase "or the termination of" in Section 3613 to codify the "continuing violation doctrine."  *See City of Philadelphia v. Wells Fargo & Co.*, 2018 WL 424451, at *3 (E.D. Pa. Jan. 16, 2018) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982)); *Cmty. Interactions - Bucks Cnty., Inc. v. Twp. of Bensalem*, 1994 WL 276476, at *5 (E.D. Pa. June 22, 1994) (concluding, based on the FHA's legislative history, that use of the word "termination" in the FHA was intended to "reaffirm the concept of *continuing violations*"). This doctrine provides that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."  *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Jointers of Am.*, 927 F.3d 1283, 1295 (3d Cir. 1991)).

To the extent that Samuel alleges that the Defendants' conduct was part of a unitary "scheme" as opposed to "isolated or sporadic acts," *id.*, the continuing violations theory "does not apply when plaintiffs are aware of the injury at the time it occurs."  *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003).  Although Samuel alleges he was confused during the leasing process and did not realize that he had signed a lease for a one-bedroom apartment until sometime after November 27, 2019, he moved into the unit on December 1, 2019 and became aware at that point.  And he personally experienced the incidents of harassment that he alleges.  The continuing violations theory therefore does not apply, and incidents that occurred prior to June 21, 2020 are outside the limitations period.

[8] Under Section 3617, "[i]nterference is 'broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws,'" and "may consist of harassment, provided that it is 'sufficiently severe or pervasive' as to create a hostile environment."  *Id.* at

Samuel's claim is construed to assert interference with his rights under 42 U.S.C. §

3604(f)(1)-(2), which prohibit discrimination "because of a handicap."[9]

Because Samuel has not alleged that Defendants entered his apartment or raised

his rent because of his health conditions, he has not established the first and second

elements of a Section 3617 violation.  Unlike cases in which plaintiffs have adequately

pled Section 3617 claims, his allegations do not establish that Defendants either expressly

linked their allegedly harassing or retaliatory conduct to an underlying handicap, or that

they singled him out for differential treatment.  *See Revock*, 853 F.3d at 114-15; *El v.*

*People's Emergency Ctr.*, 315 F. Supp.3d 837, 842 (E.D. Pa. 2018).

In *Revock v. Cowpet Bay West Condominium Association*, for example, plaintiffs

with disabilities stated claims under Section 3617 where the alleged harassment they

experienced—disparaging blog posts by neighbors—was expressly linked to their

disabilities because the neighbors repeatedly criticized plaintiffs for having support dogs.

*See* 853 F.3d at 114-15.  And in *El v. People's Emergency Center*, a Muslim plaintiff

stated a Section 3617 claim based on interference with his rights under the FHA on the

basis of religion where he alleged defendants expressly tied their harassing conduct to his

religious identity.  315 F. Supp.3d at 842.  For example, "although other tenants signed

---

113.  HUD has interpreted Section 3617 to prohibit retaliation against a person who "has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act" or "because that person reported a discriminatory housing practice to a housing provider or other authority."  24 C.F.R. § 100.400(c)(5)-(6); *see Davis v. Rubin*, 2022 WL 3037254, at *2 (3d Cir. Aug. 2, 2022) (citing 24 C.F.R. § 100.400(c)(6)) (evaluating an FHA retaliation claim and concluding that plaintiff "filing a complaint with HUD may have been protected activity" under the FHA).

[9] "Handicap" is defined as: "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment. . . . "  42 U.S.C. § 3602(h).  Samuel alleges he suffers from osteoporosis and degenerative joint disease, which cause problems walking and climbing stairs, and a cognitive disorder that causes disorientation; Defendants do not challenge Samuel's suggestion that these conditions constitute a "handicap" within the meaning of the FHA.

their leases and received the keys at the ribbon-cutting ceremony on January 25, 2017, Plaintiff did not, and when he asked why was told" that the defendant non-profit "does not care to have folks of Islamic religion inside their programs" or living in their building. *Id.* at 840. The plaintiff also alleged that a defendant mocked his "spouse's face-veil, burqa and crutches." *Id.* Beyond this, he made allegations supporting an inference that the harassing conduct he experienced targeted him specifically. For example, he received multiple lease infractions, whereas other tenants who engaged in similar or significantly worse conduct did not. *Id.*

Samuel makes no similar allegations. The only allegations that Defendants even referenced his disability are Williams' comment on October 29, 2019 that he "didn't look disabled" and—construed liberally—later that day when she suggested he walk along a trail on the property, which revealed his mobility limitations. Both of these incidents occurred prior to June 21, 2020, and are therefore outside the limitations period. Of the conduct occurring after this date, Samuel does not allege, for example, that Ward did not enter other tenants' apartments or conduct pre-inspections of their units. Nor does he allege that other tenants did not receive similar rent increases or fluctuations. Samuel's FHA claim will therefore be dismissed without prejudice.

### ii. *Live-In Aide Regulation Claim*

Samuel also brings a claim for violation of 24 C.F.R. § 982.316(b), a regulation issued pursuant to the Secretary of HUD's authority under 42 U.S.C. §§ 1437f (authorizing low-income housing assistance programs) and 3535(d) (providing the Secretary with rulemaking authority). This regulation outlines when a public housing authority "must approve a live-in aide" and when it "may refuse" to do so. 24 C.F.R. § 982.316. Under the regulation:

> A family that consists of one or more elderly, near-elderly or disabled persons may request that the PHA [public housing agency] approve a live-in aide to reside in the unit and provide necessary supportive services for a family member who is a person with disabilities.  The PHA must approve a live-in aide if needed as a reasonable accommodation in accordance with 24 CFR part 8 to make the program accessible to and usable by the family member with a disability.

24 C.F.R. § 982.316(a) (emphasis added).

> Further, under 24 C.F.R. § 982.316(b):

> At any time, the PHA may refuse to approve a particular person as a live-in aide, or may withdraw such approval, if:

> (1) The person commits fraud, bribery or any other corrupt or criminal act in connection with any federal housing program;
> (2) The person commits drug-related criminal activity or violent criminal activity; or
> (3) The person currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act.

Samuel argues that because the conditions for refusal were not applicable to his case, DCHA violated the regulations.  In response, DCHA cursorily denies "any such claim exists" without providing legal argument on this point.  Although it is unclear that a cause of action for violation of 24 C.F.R. § 982.316 or 42 U.S.C. § 1437f exists, "issues not briefed are deemed waived," *United States v. Healy*, 2013 WL 1624310, at *1 (M.D. Pa. Apr. 15, 2013) (citing *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 342 F.3d 242 (3d Cir. 2003)), as are "argument[s] consisting of no more than a conclusory assertion," *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997).  The analysis of Samuel's claim will therefore focus on the argument DCHA did make: that the claim should be dismissed because Samuel does not allege that he sought approval for a live-in aide.

Samuel has sufficiently alleged that an aide had previously been approved and that none of the conditions permitting revocation of that approval under 24 C.F.R. § 982.316(b) were present.  Construed liberally, Samuel's allegations establish that he was originally issued a two-

17

bedroom voucher in 2012 because he required a live-in aide and this determination was still in force as of October 4, 2019, when the New Castle County Housing Authority issued him a two-bedroom voucher.  And, in his August 2021 email to Blackburn, he stated that he moved to the Birchwood at Concord Point "from a two bedroom unit with my son as my live in aide."  He also alleges that he has previously ported vouchers between housing authorities without having to obtain reapproval of his aide, and DCHA provides no argument that the regulations require such reapproval after a transfer.  DCHA Defendants' Motion will therefore be denied as to Samuel's claim for violation of HUD's live-in aide regulations.[10]

### iii.   ADA Claims

Samuel brings a claim under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182.  Title III prohibits discrimination based on disability in places of public accommodation, providing: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Certain private entities fall within the definition of "public accommodation" if their "operations . . . affect commerce," including: "an inn, hotel, motel, *or other place of lodging*."  42 U.S.C. § 12181(7)(A) (emphasis added).  However, the Third Circuit, relying on the ADA's legislative history, has endorsed the view that "other place of lodging" does not include apartment buildings like the Birchwood at Concord Point.  *Regents of Mercersburg Coll. v. Republic Franklin Ins.*

---

[10] Ingerman Defendants do not address this claim in their Motion.  However, 24 C.F.R. § 982.316 governs the authority of public housing agencies and Samuel does not allege that Ingerman Defendants had any involvement in the approval or alleged revocation of his aide, beyond conclusory and speculative allegations that he was victim of a collusive scheme between DCHA and Ingerman.  This claim will therefore only remain live against DCHA Defendants.

*Co.*, 458 F.3d 159, 165 n.8 (3d Cir. 2006) ("We agree that residential facilities such as apartments and condominiums are not transient lodging and, therefore, not subject to ADA compliance.").  That a building accepts federal funds in the form of housing vouchers does not necessarily change this analysis.  *El*, 315 F. Supp.3d at 844 ("For purposes of Title III, 'apartments and condominiums do not constitute public accommodations,' even where the property accepts tenants receiving federal housing subsidies.").[11]  Because the Birchword at Concord Point building is not a "public accommodation" within the meaning of the ADA, Samuel's ADA claim will be dismissed with prejudice.

### iv.   Claims Pursuant to Federal Criminal Statutes

Samuel brings claims alleging violations of federal criminal statutes—18 U.S.C. § 241 (prohibiting conspiracy against rights "secured . . . by the Constitution or laws of the United States"), and 18 U.S.C. § 2261A (prohibiting stalking).  These statutes do not create civil causes of action, and Samuel's claims alleging violations of them will therefore be dismissed with prejudice.  *See Weisman v. Baur*, 2021 WL 3403519, at *2 (E.D. Pa. Aug. 4, 2021) (dismissing civil claim brought under 18 U.S.C. § 2261A); *Humphrey v. Pa. Ct. of Common Pleas of Phila.*, 2021 WL 268498, at *2 n.3 (E.D. Pa. Jan. 27, 2021) ("[N]umerous federal courts have held that no private right of action exists under [the Violence Against Women Act, 18 U.S.C. §§ 2261-

---

[11] The Third Circuit has not yet addressed whether receipt of federal funds renders an apartment building a "public accommodation" within the meaning of the ADA.  However, the district courts that have considered the issue have come to the same conclusion that the *El* court did.  *See Sanders v. Mizzanti Real Estate*, 2023 WL 4089277, at *3 (W.D. Pa. Apr. 17, 2023), *report and recommendation adopted by* 2023 WL 4089095 (W.D. Pa. June 20, 2023); *Burke v. Verizon Commc'ns, Inc.*, 2023 WL 2535165, at *10 (S.D.N.Y. Mar. 16, 2023); *Doyle v. Mount Vernon Co.*, 2021 WL 4593525, at *1 (D.N.H. Oct. 6, 2021); *Pavalone v. Preservation Mgmt. Inc.*, 2019 WL 1117931, at *7 (M.D. Pa. Jan. 8, 2019); *Want v. Shindle Props., LLC*, 2018 WL 5392521, at *5-6 (D. Md. Oct. 29, 2018); *Stevens v. Ashley Mgmt. LLC*, 2016 WL 632005, at *3 (W.D.N.Y. Feb. 17, 2016); *Parham v. CIH Props., Inc.*, 2015 WL 5294683, at *3 (D.D.C. Sept. 8, 2015); *Mitchell v. Walters*, 2010 WL 3614210, at *4 (D.N.J. Sept. 8, 2010); *Reyes v. Fairfield Props.*, 661 F. Supp.2d 249, 264 n.5 (E.D.N.Y. 2009).  *But see Simmons v. Langston Lane Ltd. P'ship*, 2023 WL 2733975, at n.1 (D.D.C. Mar. 31, 2023) ("Although some courts have concluded that private apartment complexes are not subject to the ADA because they do not constitute 'public accommodations,' Defendants concede that the federally subsidized housing at issue in this case is subject to the ADA." (internal citations omitted)).

2262].”); *McCauley v. Computer Aid Inc.*, 447 F. Supp.2d 469, 477 (E.D. Pa. 2006) (“Plaintiff's civil claims under 18 U.S.C. §§ 241 and 242 are inappropriate because 18 U.S.C. §§ 241 and 242 are criminal statutes that do not provide for a civil remedy. . . .  It is well-settled that these criminal statutes cannot be the bases for remedy in a civil suit.”), *aff'd*, 242 F. App'x 810 (3d Cir. 2007).

### v.  FTC Act Claim

Samuel also alleges Defendants' conduct violated the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), which prohibits “[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]”  However, there is no private right of action under the FTC Act, meaning private litigants like Samuel cannot bring lawsuits based on violations of the Act.  *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990) (“Neither of [the FDA or the FTC]'s constituent statutes creates an express or implied private right of action.” (citing *Alfred Dunhill Ltd. v. Interstate Cigar Co., Inc.*, 499 F.3d 232, 237 (2d Cir. 1974))); *Alfred Dunhill Ltd.*, 499 F.3d at 237 (“[T]he provisions of the Federal Trade Commission Act may be enforced only by the Federal Trade Commission.”); *Gilliam v. Nat'l Comm'n for Certification of Physician Assistants, Inc.*, 727 F. Supp. 1512, 1514 (E.D. Pa. 1989) (“[T]here is no private right of action under [the FTC Act].”), *aff'd*, 898 F.2d 140 (3d Cir. 1990) (table decision); *Peeples v. Portfolio Recovery Assocs.*, LLC, 2023 U.S. Dist. LEXIS 12439, at *8 n.3 (E.D. Pa. Jan. 24, 2023) (“This Court has . . . held that the FTCA does not provide a private right of action.”).  Samuel's FTC Act claim will therefore be dismissed with prejudice.

### vi.  *State Law Claims*[12]

In addition to his federal claims, Samuel brings two claims under Pennsylvania law—violation of Section 201-3 of the Pennsylvania UTPCPL, which prohibits "unfair or deceptive acts or practices" in trade or commerce, and intentional infliction of emotional distress.

### a.  UTPCPL

Samuel alleges Defendants violated the Pennsylvania UTPCPL, which declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful."  73 Pa. Cons. Stat. § 201-3(a).  The UTPCPL defines twenty specific unlawful acts and practices, *id.* § 201-2(4)(i)-(xx), and also contains a "catch-all" provision that generally prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," *id.* § 201-2(4)(xxi).

The UTPCPL provides a private right of action to:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act[.]

*Id.* § 201-9.2(a).

Regardless of the type of unlawful act alleged, a plaintiff bringing a claim under Section 201-9.2 must show:

> (1) [T]hey purchased or leased "goods or services primarily for a personal, family, or household purpose"; (2) they suffered an "ascertainable loss of money or property"; (3) the loss occurred "as a result of the use or employment by a vendor of a method, act, or practice declared unlawful by" the CPL; and (4) the consumer justifiably relied upon the unfair or deceptive business practice when making the

---

[12] In addition to the numbered claims listed in the Amended Complaint and addressed in this Memorandum Opinion, Samuel scatters legal definitions for the terms harassment, fraud, and constructive eviction among the factual allegations in the body of his Amended Complaint.  To the extent that Samuel seeks to bring independent tort claims on these bases under Pennsylvania law, he must do so in accordance with Federal Rule of Civil Procedure 10(b).  Rule 10(b) requires claims to be stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . .  If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count. . . ."

purchasing decision.

*Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021)

Although Samuel cites the entire UTPCPL, he specifically quotes the law's prohibition on "[a]dvertising goods or services with intent not to sell them as advertised." *Id.* § 201-2(4)(ix). Nonetheless, Defendants also address whether his allegations state a claim under its catch-all provision.

Samuel alleges that Defendants violated the UTPCPL by engaging in a "bait-and-switch scheme." According to him, the "bait" was the February 2019 advertisement he received stating two-bedroom apartments were "soon becoming available" in the Birchwood at Concord Point and Williams' subsequent September 2019 email stating that two-bedroom apartments were "Available Now!" His HCV was then "wrongfully downgraded" to a one-bedroom voucher "through a process of manipulating dates, numbers and my signature"; "[t]his falsified 1 bedroom voucher gave the appearance that when [he] transferred into the Delaware County Housing Authority, that [he] came with a 1 bedroom voucher instead of a 2 bedroom voucher." Finally, Samuel was given, and signed, a lease for a one-bedroom apartment.

As to the DCHA Defendants, their role in the purported "scheme" was the downgrading of Samuel's voucher from two bedrooms to one. Because Samuel does not allege that any DCHA Defendant was involved in the advertising for apartments in Ingerman buildings, he fails to state a false advertising claim under Section 201-2(4)(ix) against them. He also fails to state a claim against DCHA Defendants under the catch-all provision, as he does not allege that he relied on any DCHA Defendant's conduct or communications regarding the voucher in signing the lease with Ingerman.

As to the Ingerman Defendants, a claim for violation of Section 201-2(4)(ix) requires showing "that the defendants' advertisement is a false representation of fact." *Weinberg v. Sun*

*Co., Inc.*, 740 A.2d 1152, 1167 (Pa. Super. 1999), *rev'd in part on other grounds*, 777 A.2d 442

(Pa. 2001).  Samuel has not alleged that either the February 2019 advertisement or Williams'

September 2019 email—which advertised that two-bedroom apartments were or would be

"available"—was false.  Nor has he alleged that he viewed any advertisement pertaining to the

specific unit he ultimately leased.  As he has not alleged that Ingerman's apartment

advertisements were false, he fails to state a claim under Section 201-2(4)(ix) against the

Ingerman Defendants.  And he has not alleged conduct on their part connected to the lease that

"create[d] a likelihood of confusion or of misunderstanding" and would support a claim under

the catch-all provision.  Although Samuel alleges that Williams informed him roughly one month

before he signed the lease that he had been approved for a two-bedroom apartment and that the

lease he signed was "unbeknownst to [him] at that time" for a one-bedroom apartment, he does

not allege that Ingerman Defendants concealed this information from him or falsely represented

to him that the unit was a two-bedroom apartment.  Samuel's UTPCPL claim will be dismissed

without prejudice.

### b.  Intentional Infliction of Emotional Distress

Finally, Samuel brings a claim for intentional infliction of emotional distress.  Under

Pennsylvania law, "[t]he elements of intentional infliction of emotional distress are (1) a person

who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe

emotional distress to another."  *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. 2010).

"[T]he availability of recovery for [intentional infliction of emotional distress] is 'highly

circumscribed[.]'"  *Gray v. Huntzinger*, 147 A.3d 924, 928 (Pa. Super. 2016).  "[T]he conduct

must be so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."

*Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.3d 1122, 1125 (Pa. Super. 1987)).  The conduct Samuel alleges—the downgrading of his voucher, the loss of his aide, fluctuations in his rent, and three unannounced entries into his apartment by a maintenance worker—does not rise to this level.  *See Williams v. Guzzardi*, 875 F.2d 46, 52 (3d Cir. 1989) (holding that "[a]lthough the case is close," tenant could establish his landlord's conduct was outrageous where landlord "in attempting to evict him from the premises, removed the door to his apartment; after tricking him into giving up his keys, told a police officer that he was a trespasser; gave him no opportunity to remove his belongings at that point; publicly announced that he was evicted for running a house of prostitution; and threw his belongings into the street").  Samuel's claim for intentional infliction of emotion distress will be dismissed without prejudice.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**
_____
**WENDY BEETLESTONE, J.**